[Crim. No. 17039. In Bank. June 12, 1974.]

THE PEOPLE, Plaintiff and Appellant, v.
JAMES E. CONKLIN, Defendant and Respondent.

**COUNSEL**

Joseph P. Busch, District Attorney, Harry B. Sondheim, Harry Wood and Arnold T. Guminski, Deputy District Attorneys, for Plaintiff and Appellant.

Eagleton & Petterson and James D. Petterson for Defendant and Respondent.

**OPINION**

**SULLIVAN, J.**—Defendant James E. Conklin was charged by information with committing several acts prohibited by Penal Code section 631, sub-

division (a).[1] He demurred to the information (§ 1004, subd. 4), asserting that section 631 is invalid because it conflicts with, or attempts to regulate the same area covered by title III of the Omnibus Crime Control and Safe Streets Act of 1968. (18 U.S.C.A. §§ 2510-2520; referred to hereafter as title III.) The trial court sustained the demurrer and entered a judgment of dismissal. (§ 1008.) The People appeal from that judgment. (§ 1238, subd. (a)(2).)

The People contend that title III has not preempted the field of wiretapping and that, in any event, the state statute does not conflict with federal law. Defendant, on the other hand, argues that in enacting title III, Congress expressed its intent to occupy the entire field of wire communications, and alternatively, that even if it were not the intent of Congress to regulate the entire field, section 631 conflicts with title III and must therefore yield to it under the supremacy clause of the federal Constitution.

The respective powers of the federal and state governments to regulate the field of communications flow from different sources. Federal power finds its origin in the commerce clause (*Benanti* v. *United States* (1957) 355 U.S. 96, 104 [2 L.Ed.2d 126, 132, 78 S.Ct. 155] [applying title III's predecessor, former § 605 of the Federal Communications Act of 1934]; *Halpin* v. *Superior Court* (1972) 6 Cal.3d 885, 899 [101 Cal. Rptr. 375, 495 P.2d 1295], cert. den., 409 U.S. 982 [34 L.Ed.2d 246, 93 S.Ct. 318]), even where the communications are entirely intrastate

---

[1] Penal Code section 631, subdivision (a) provides in part: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally *taps,* or *makes any unauthorized connection,* whether physically, electrically, acoustically, inductively, or otherwise, *with any* telegraph or *telephone wire, line, cable, or instrument,* including the wire, line, cable, or instrument of any internal telephonic communication system, *or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any such wire, line, or cable, or is being sent from,* or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, *or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above* in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment in the state prison not exceeding three years, or by both such fine and imprisonment in the county jail or in the state prison." (Italics added.)

The information charged defendant with having committed those acts described in the italicized language of the section. The transcript of the preliminary hearing reveals that defendant is a supervising welfare fraud investigator for the Department of Public Social Services and that he installed a system designed to intercept conversations occurring on each of the telephones located in the investigator's office.

Hereafter, unless otherwise indicated, all section references are to the Penal Code.

(*Weiss* v. *United States* (1939) 308 U.S. 321, 327 [84 L.Ed. 298, 301, 60 S.Ct. 269]). (See Sen. Rep. No. 1097 [referred to hereafter as the Senate Report] 2 U.S. Code Cong. & Admin. News (1968) pp. 2112, 2180.)[2] State power is essentially the police power which is among those powers "reserved to the States respectively, or to the people." (U.S. Const., 10th Amend.)

Although some differences in scope exist, the federal and state acts regulate the same area. In general terms, title III prohibits the interception of wire and oral communications (18 U.S.C.A. § 2511(1)(a)) and their disclosure or use (18 U.S.C.A. § 2511(1)(c)-(d))[3] except where court authorization is obtained by a law enforcement official (18 U.S.C.A. §§ 2516-2518) and with other limited exceptions. The state Invasion of Privacy Act (§§ 630-637.2) forbids wiretapping (§ 631) and electronic eavesdropping (§ 632) except by law enforcement officers where such activity was permitted prior to the enactment of the state act (§ 633) and with other limited exceptions (see, e.g., § 633.5). Thus the scheme of the federal act is based on the type of communication, that is, whether it is wire or oral; the state act, by contrast, on the type of surveillance, that is, whether it is wiretapping or eavesdropping. (Note (1969) 57 Cal.L.Rev. 1182, 1210.) Where evidence is obtained by unlawfully intercepting a communication, both acts make it inadmissible in any judicial, administrative, legislative, or any other proceeding. (18 U.S.C.A. § 2515; §§ 631, 632.)

[2]The Senate Report refers to other bases of federal power in enacting title III aside from the commerce clause. They include the equal protection clause of the Fourteenth Amendment as well as the right of privacy "arising under certain provisions of the Bill of Rights" and applied to the states by the Fourteenth Amendment. (Sen. Rep., p. 2180.)

[3]Section 2511(1)(a) provides: "(1) Except as otherwise specifically provided in this chapter any person who—

"(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication; . . . [¶] shall be fined not more than $10,000 or imprisoned not more than five years, or both."

The same punishment is imposed in subparagraphs (c) and (d), paragraph (1) of the section for unauthorized disclosure or use, respectively, of intercepted communications.

The terms "wire communication" and "oral communication" are defined in section 2510 of title 18 as follows:

"(1) 'wire communication' means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications;

"(2) 'oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation."

In determining the validity of a state law which attempts to regulate the same subject as a federal law, a variety of expressions have been used: "conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula." (*Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67, fn. omitted [85 L.Ed. 581, 587, 61 S.Ct. 399]; see also *Pennsylvania* v. *Nelson* (1956) 350 U.S. 497, 501-502 [100 L.Ed. 640, 651-652, 76 S.Ct. 477].) **(2)** Nonetheless, we are of the view that we should resolve the issue presented here according to the two-part test set forth in *Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 141 [10 L.Ed.2d 248, 256, 83 S.Ct. 1210], and restated in *Head* v. *New Mexico Board* (1963) 374 U.S. 424 [10 L.Ed.2d 983, 83 S.Ct. 1759]. In *Head* (374 U.S. at p. 430 [10 L.Ed.2d at p. 989]), the high court stated, "In areas of the law not inherently requiring national uniformity, our decisions are clear in requiring that state statutes, otherwise valid, must be upheld unless there is found 'such actual conflict between the two schemes of regulation that both cannot stand in the same area, [or] evidence of a congressional design to preempt the field.' [Citation.]" (Fn. omitted.)[4]

---

[4]Although the cases have not applied a uniform definition to the term "preemption," we adhere to the meaning used in *Florida Avocado Growers* and *Head*. In those cases, the high court limited the meaning of the term to refer to the *intent* of Congress to occupy an entire field, thus precluding state regulation which touches upon any aspect of the same area. However, the term preemption has often been used more broadly and may refer to any situation—both an actual *conflict* between federal and state laws and a congressional *intent* to occupy the entire field—in which a state law touching upon the same area as federal law is declared invalid. It does not appear, however, that the label of preemption has been used in situations where, even in the *absence* of federal regulation, a state act has been invalidated because it attempts to regulate an area which inherently and necessarily requires uniformity and thus demands exclusive regulation, if any, by the federal government. (See, e.g., *Goldstein* v. *California* (1973) 412 U.S. 546, 551-554 [37 L.Ed.2d 163, 171-172, 93 S.Ct. 2303]; *Florida Avocado Growers* v. *Paul, supra,* 373 U.S. at pp. 143-144 [10 L.Ed.2d at pp. 257-258]; *Cooley* v. *Board of Wardens* (1851) 53 U.S. (12 How.) 298, 318-319 [13 L.Ed. 996, 1004-1005].)

Preemption, in the sense used by *Florida Avocado Growers* (373 U.S. at pp. 146-152 [10 L.Ed.2d at pp. 259-262]) and *Head* (374 U.S. at pp. 430-432 [10 L.Ed.2d at pp. 988-990]), simply describes the intent of Congress, in regulating an area in which it *may* exercise exclusive power, to displace or preclude state regulation on the same subject, that is, a design to occupy the entire field. Here, unlike the situation where the subject of regulation inherently requires uniformity, it is assumed that state regulation is permissible except where Congress, in the exercise of a potentially exclusive federal power, decides that state law affecting a part or all of the same area, should not be allowed. Where state law has preexisted the enactment of federal law and Congress expresses its desire for exclusive regulation, it is often said that the former has been superseded (see, e.g., *Cloverleaf Co.* v. *Patterson* (1942) 315 U.S.

In our application of this twofold test, we shall consider the second part of it first. ■ We therefore proceed to determine whether it was the intent of Congress that the provisions of title III regulating the interception of wire communications would preempt state law. In other words, did Congress intend to occupy the entire field and thereby intend to exclude state regulation on the same subject matter even where the federal and state laws are not in conflict with each other?

"The settled mandate governing this inquiry, in deference to the fact that a state regulation of this kind is an exercise of the 'historic police powers of the States,' is not to decree such a federal displacement 'unless that was the clear and manifest purpose of Congress,' [citation]. In other words, we are not to conclude that Congress legislated the ouster of [a state] statute . . . in the absence of an unambiguous congressional mandate to that effect." (*Florida Avocado Growers* v. *Paul, supra,* 373 U.S. 132, 146-147 [10 L.Ed.2d 248, 259] [holding that no preemptive design can be discerned in the Federal Agricultural Adjustment Act respecting

---

148, 162 [86 L.Ed. 754, 766, 62 S.Ct. 491]); for the same reason, all attempts at future state regulations are precluded.

Under the concept of preemption as we have defined it, the inquiry focuses on whether Congress has "ordained that the state regulation shall yield." (*Florida Avocado Growers* v. *Paul, supra,* 373 U.S. at p. 146 [10 L.Ed.2d at p. 259].) If Congress so intended, then it is said that "federal law excludes local regulation, even though the latter does no more than supplement the former." (*Campbell* v. *Hussey* (1961) 368 U.S. 297, 302 [7 L.Ed.2d 299, 302-303, 82 S.Ct. 327].)

On the other hand, the existence of a *conflict* between federal and state laws can occur only where both sovereignties have enacted legislation which touches upon the same area, i.e., concurrent regulation. Again, the inquiry assumes that the area regulated does not necessarily require uniformity; it also assumes that Congress has not expressed an intent to occupy the field. Accordingly, concurrent regulation is proper unless a state act is inconsistent with federal law.

Whether state regulation is invalid because it actually conflicts with existing federal law presents a problem conceptually distinct from the idea of preemption as we have defined it (see *Campbell* v. *Hussey, supra,* 368 U.S. at p. 300 [7 L.Ed.2d at p. 301]; stating that "[w]e do not have here the question whether Georgia's law conflicts with the federal law [but] . . . we have the question of pre-emption") and therefore necessitates separate consideration. (See *Florida Avocado Growers* v. *Paul, supra,* 373 U.S. at pp. 142-146 [10 L.Ed.2d at pp. 256-259]; *Head* v. *New Mexico Board, supra,* 374 U.S. at p. 432 [10 L.Ed.2d at p. 989]; cf. *Goldstein* v. *California, supra,* 412 U.S. 546, 560-571 [37 L.Ed.2d 163, 176-182] [appearing to apply the test in determining the existence of a conflict to the question whether Congress intended to preempt state law].) Where an irreconcilable conflict is found to exist, the state act must yield to federal law by operation of the supremacy clause. (See, e.g., *Perez* v. *Campbell* (1971) 402 U.S. 637, 652 [29 L.Ed.2d 233, 243-244, 91 S.Ct. 1704] [state law on automobile financial responsibility must yield where it conflicts with the federal Bankruptcy Act]; *Free* v. *Bland* (1962) 369 U.S. 663, 666, 668 [8 L.Ed.2d 180, 183-185, 82 S.Ct. 1089] [state community property law must yield where it conflicts with federal law governing right of survivorship for co-owners of United States Savings Bonds]; *Benanti* v. *United States, supra,* 355 U.S. 96, 105-106 [2 L.Ed.2d 126, 132-133] [evidence obtained by a wiretap permitted by state law not admissible in a federal

maturity standards for agricultural products]; see also *Head* v. *New Mexico Board, supra,* 374 U.S. 424, 431 [10 L.Ed.2d 983, 989].)[5]

The question confronting us was answered in part by our decision in *Halpin* v. *Superior Court, supra,* 6 Cal.3d 885. *Halpin* involved a warrantless interception of a conversation over a jailhouse telephone. It was asserted that the interception violated title III. The People argued that the application of title III, which prohibits the warrantless interception of wire communications, would improperly infringe on the right of the state to administer the affairs of its penal institutions. Having explained that the reserved powers of the state under the Tenth Amendment cannot override an exercise of federal power under the commerce clause, as represented in title III, we rejected the People's argument and ordered that the evidence be suppressed.

At the same time, *Halpin* indicated that title III was not intended to occupy the entire field of wiretapping. We declared, in reference to the federal act, that "Congress intended to enact comprehensive national legislation, against which all then existing federal and state legislation was to be measured" but also explained that it "left room for the states to supplement the law in certain areas, provided the regulations are not more permissive. [Citation.]" (*Id.* at pp. 898-899; fns. omitted.) Thus it is clear that when we stated in *Halpin* that "title III has *preempted* particular fields of wiretapping" (*id.* at p. 900; italics added), we were employing the term in its broader sense (see fn. 4, *ante*) and did not imply that Congress intended to exercise exclusive power over the subject of wire communications.

Our conclusion in *Halpin* that Congress in enacting title III did not intend to occupy the entire field is supported by two indications of its intent. The first is a statement of congressional findings expressing the need for

court where state law inconsistent with § 605 of the Federal Communications Act of 1934]; *In re Marriage of Fithian* (1974) 10 Cal.3d 592, 604 [111 Cal.Rptr. 369, 517 P.2d 449] [state community property law as applied to serviceman's retirement pay not in conflict with federal law].)

[5]On the other hand, where "Congress has not stated specifically whether a federal statute has occupied a field in which the States are otherwise free to legislate, different criteria have furnished touchstones for decision." (*Pennsylvania* v. *Nelson, supra,* 350 U.S. 497, 501-502, fn. omitted [100 L.Ed. 640, 651-652].) These tests are: "*First,* '[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it' [citation]" (*id.* at p. 502 [100 L.Ed. at p. 652]); "*Second,* the federal statutes 'touch a field in which the federal interest is so dominant that the federal system [must] be assumed to preclude enforcement of state laws on the same subject' [citations]" (*id.* at p. 504, fn. omitted [100 L.Ed. at p. 653]); and "*Third,* enforcement of [the state act] presents a serious danger of conflict with the administration of the federal program" (*id.* at p. 505 [100 L.Ed. at p. 654]).

federal legislation and its purpose (§ 801, Pub. L. 90-351; 82 Stat. 211); the second is a report referred to in *Halpin,* which was submitted by the Senate Committee on the Judiciary (Sen. Rep. No. 1097, 90th Cong., 2d Sess. (1968) 2 U.S. Code Cong. & Admin. News, p. 2112.) Since each of these sources expresses the preemptive design of Congress, if any, we need not apply the tests collated by *Pennsylvania* v. *Nelson, supra* (see fn. 5, *ante*); rather, we must ascertain whether these sources evince a " 'clear and manifest purpose of Congress' " (*Florida Avocado Growers* v. *Paul, supra,* 373 U.S. at p. 146 [10 L.Ed.2d at p. 259]) to displace state regulation in the same area.

The congressional findings declare in part: "In order to protect effectively the privacy of wire and oral communications, to protect the integrity of court and administrative proceedings, and to prevent the obstruction of interstate commerce, it is necessary for Congress to define on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized, to prohibit any unauthorized interception of such communications, and the use of the contents thereof in evidence in courts and administrative proceedings." (§ 801, par. (b), Pub. L. 90-351; 82 Stat. 211.)[6]

These findings are amplified by the Senate Report.[7] It states, "Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." (Sen. Rep., at p. 2153.) It is also indicated that the "major purpose of title III is to combat organized crime." (*Id.* at p. 2157.) Having described the activities of organized crime in gambling, narcotics, loan sharking and its corruptive effect on our "democratic processes," the report concludes that "authorized wiretapping and electronic surveillance techniques by law enforcement officials are indispensable legal tools" against organized criminals. (*Id.* at p. 2161.)

---

[6]Congress also found that because wire and oral communications are used by organized criminals, interception of their communications "is an indispensable aid to law enforcement and the administration of justice" (§ 801, par. (c), Pub. L. 90-351); and further, that interception of wire and oral communications should be permitted only by court order if proper justification is made and in certain types of major offenses (§ 801, par. (d), Pub. L. 90-351).

The provisions of title III. now in a codified form (18 U.S.C.A. §§ 2510-2520), were stated in section 802 of Public Law 90-351; 82 Stat. 212-225.) These provisions now comprise a chapter entitled "Wire Interception and Interception of Oral Communications."

[7]The House Committee on the Judiciary submitted a similar report in House Report No. 488 (90th Cong., 2d Session (1968) 2 U.S. Code Cong. & Admin. News, p. 2112.)

Two decisions of the United States Supreme Court had a significant impact in the enactment of title III: *Berger* v. *New York* (1967) 388 U.S. 41 [18 L.Ed.2d 1040, 87 S.Ct. 1873], and *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507]. *Berger* invalidated a state statute permitting overly broad electronic eavesdropping in violation of the Fourth Amendment. (*Id.* at pp. 58-59 [18 L.Ed.2d at pp. 1051-1053].) Contrary to prior cases involving the exclusion of evidence obtained by eavesdropping, *Berger* did not appear to rely on the fact that the eavesdropping was accompanied by a physical trespass of a constitutionally protected area; thus it has been said that *Berger* "sounded the death knell of the trespass doctrine." (Note, *supra,* 57 Cal.L.Rev. 1182, 1192.) The abandonment of the trespass doctrine became a certainty in *Katz*. There conversations in a public telephone booth were overheard by means of an electronic recording device attached to the outside of the booth. In *Katz*, the high court unequivocally rejected the trespass doctrine, explaining that a constitutional right to privacy "protects people—and not simply 'areas'—against unreasonable searches and seizures." (*Katz,* 389 U.S. at p. 353 [19 L.Ed.2d at p. 583].) Therefore, "[t]he Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." (*Ibid.*)

One of the objectives of title III was to ensure nationwide compliance with the *Berger* and *Katz* decisions.[8] Having traced the development of decisions involving intercepted communications, the Senate Report expresses concern that in the light of changed standards declared in *Berger* and *Katz,* state officers may be subject to federal prosecution even where the interception is authorized by state statutes. (Sen. Rep. at p. 2155.) Consequently, the report indicates, state statutes "must now be reformed" (*id.* at p. 2156); the "need for comprehensive, fair and effective reform setting uniform standards is obvious. New protections for privacy must be

---

[8]The *Berger* opinion itself intimated the need for federal regulation of electronic eavesdropping. The court stated, "As science developed these detection techniques, lawmakers, sensing the resulting invasion of individual privacy, have provided some statutory protection for the public. Seven States . . . prohibit surreptitious eavesdropping by mechanical or electronic device. However, all save [one] permit official court-ordered eavesdropping. Some 36 States prohibit wiretapping. But of these, 27 permit 'authorized' interception of some type. Federal law, as we have seen, prohibits interception and divulging or publishing of the content of wiretaps without exception. In sum, it is fair to say that wiretapping on the whole is outlawed, except for permissive use by law enforcement officials in some States; while electronic eavesdropping is—save for seven States—permitted both officially and privately. And, in six of the seven States electronic eavesdropping ('bugging') is permissible on court order." (*Berger* v. *New York, supra,* 388 U.S. at pp. 47-49, fns. omitted [18 L.Ed.2d at pp. 1045-1046].)

enacted. Guidance and supervision must be given to State and Federal law enforcement officers. This can only be accomplished through national legislation." (*Ibid.*)

The impact of *Berger* and *Katz* is reflected in the fact that these decisions necessitated changes in the original bill proposing federal regulation of electronic surveillance. In other words, title III constituted a "combination" of a bill introduced prior to the *Berger* decision and a bill introduced subsequent to it. (Sen. Rep., at p. 2153.) Thus in explaining the purpose of the federal act, the Senate Report states that the act "conforms to the constitutional standards set out in" the two decisions. (Sen. Rep., at p. 2113.)

Ordinarily, where Congress has stated a need for uniform standards, it is expressing an intent to occupy the entire field. (See *Florida Avocado Growers* v. *Paul, supra,* 373 U.S. 132, 147; *Campbell* v. *Hussey, supra,* 368 U.S. 297.) Here it has stated that one of the purposes of title III is to provide "on a *uniform* basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." (§ 801, par. (b), Pub. L. 90-351, 82 Stat. 211; italics added.) Had Congress said nothing more, it would appear as though a design to preempt the entire field had been expressed.

However, the Senate Report indicates that Congress anticipated state regulation of electronic surveillance. As we discussed in *Halpin* (6 Cal.3d at p. 899, fn. 17), the report refers to numerous areas touching upon the field of electronic surveillance which state law may control. Thus, in referring to a need for uniform nationwide standards, it appears that Congress was not expressing an intent to preempt the entire field; rather, it was emphasizing the need to ensure nationwide compliance with the newly declared standards in *Berger* and *Katz*. Accordingly, we conclude that Congress did not intend to occupy the entire field of electronic surveillance to the exclusion of state regulation.

We now turn to the *first* part of the test set forth in *Florida Avocado Growers* and *Head,* namely, whether there is " 'such actual conflict between the two schemes of regulation that both cannot stand in the same area.' " (*Head* v. *New Mexico Board, supra,* 374 U.S. at p. 430 [10 L.Ed.2d at p. 989].) This inquiry focuses on the crucial issue in this case. Whether this state may regulate the interception of wire communications is said to depend on whether the state act "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Hines* v. *Davidowitz, supra,* 312 U.S. 52, 67, fn. omitted [85 L.Ed. 581, 587]; see

also *Head* v. *New Mexico Board, supra,* 374 U.S. at p. 432 [10 L.Ed.2d at pp. 989-990]; *Florida Avocado Growers* v. *Paul, supra,* 373 U.S. 132, 141.) The test has also been described as "whether both regulations can be enforced without impairing the federal superintendence of the field." (*Florida Avocado Growers* v. *Paul, supra,* 373 U.S. at p. 142 [10 L.Ed.2d at p. 257].)

The federal and state acts have a common purpose. As we have explained, one of the purposes of title III is to guarantee the privacy of wire and oral communications; a similar purpose is imported in the state Invasion of Privacy Act, the Legislature having declared that its intent was "to protect the right of privacy of the people of this state." (§ 630; see also Cal. Const., art. I, § 19.)

Defendants contend that, notwithstanding these similar purposes, a conflict exists between section 631, subdivision (a) and title III in that the former forbids wiretapping except by law enforcement officers (§ 633), unless *all* parties to a communication consent (see fn. 1, *ante*) while the latter (18 U.S.C.A. § 2511(2)(c)-(d))[9] permits the same act where the consent of only *one* person is obtained. The consent provisions in section 2511 of the federal act constitute an exception to the general rule requiring prior court authorization for the interception of communications. (18 U.S.C.A. §§ 2516, 2518.) They allow any person acting under color of law or any private individual to intercept a communication where such a person is a party to the communication or where one party to a communication has given his consent. Thus defendant contends that the state law under which he was charged impermissibly conflicts with these federal consent provisions and is invalid.

The all-party consent rule contained in section 631 is only one of several differences existing between the state Invasion of Privacy Act and title III.[10] However, under the legal rules we have explicated, the mere

---

[9]Subparagraphs (c) and (d) (18 U.S.C.A. § 2511(2)) provide as follows: "(c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

"(d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act."

[10]Other differences in the federal and state acts exist. For example, the first criminal act described in section 631—to "make[ ] any unauthorized connection" to a tele-

existence of a different state standard does not inevitably lead to a conflict with federal law; rather, the challenged state law must in some manner impair the attainment of federal objectives. We do not perceive that federal objectives are impeded here. To the contrary, we believe that section 631 is consistent with federal purposes and that its more restrictive rule concerning consent was anticipated by Congress.

The legislative history of title III reveals that Congress intended that the states be allowed to enact more restrictive laws designed to protect the right of privacy. In section 2516, paragraph (2)[11] of the federal act, Congress provided that a state judge may authorize the interception of

graph or telephone line—is committed even where there is no intent to intercept a message, although the ultimate purpose of the section is to prevent the interception of telephone communications. (See *People* v. *Trieber* (1946) 28 Cal.2d 657, 662 [171 P.2d 1], construing substantially similar language in former § 640; see also Note, *supra,* 57 Cal.L.Rev. 1182, 1201.) By contrast, the federal statute, declaring it unlawful to "willfully intercept[ ] . . . any wire or oral communication," makes an interception an essential element of the crime. (18 U.S.C.A. § 2511(1)(a); see also *United States* v. *Carroll* (D.D.C. 1971) 337 F.Supp. 1260, 1262.)

Section 631 also forbids making any "unauthorized connection" with "any internal telephonic communication system." (See fn. 1, *ante;* Note, *supra,* 57 Cal.L.Rev. 1182, 1202-1203.) Title III does not expressly extend its protection to internal communication systems. (See 18 U.S.C.A. § 2511(1)(a).) Such a system is clearly not a type of wire communications as defined by title III (18 U.S.C.A. § 2510(1); see fn. 3, *ante*) but is arguably a form of oral communications (18 U.S.C.A. § 2510(2); see Note, *supra,* 57 Cal.L.Rev. 1182, 1203, fn. 127). If it constitutes the latter then the federal act would apply to an internal system, assuming that such application is a proper exercise of federal power.

It also appears that while title III permits the interception of communications when a state warrant is obtained (18 U.S.C.A. § 2518) under limited circumstances (18 U.S.C.A. § 2516), California has not authorized the interception of communications by a warrant. (Note, *supra,* 57 Cal.L.Rev. 1182, 1212.) Other differences are discussed in *People* v. *Buchanan* (1972) 26 Cal.App.3d 274, 288, fn. 12 [103 Cal.Rptr. 66]; *Pacific Tel. & Tel. Co.* v. *Superior Court* (1970) 2 Cal.3d 161, 165, fn. 3 [84 Cal.Rptr. 718, 465 P.2d 854]; see also Note, *supra,* 57 Cal.L.Rev. 1182, for an extensive comparison of the two acts.

[11]Paragraph (2) of section 2516 provides as follows: "The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire or oral communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses."

wire and oral communications by state law enforcement officers where prior court approval is obtained under federal standards and *"in conformity with . . . the applicable State statute."* (Italics added.) Thus the language of this section indicates that Congress anticipated state regulation in the field of intercepting communications, including wiretapping. The Senate Report exposes the purpose of Congress in enacting paragraph (2) of section 2516. It states, "No applications may be authorized unless a specific State statute permits it. The State statute must meet the *minimum standards* reflected as a whole in the proposed chapter [title III]. The proposed provision envisions that States would be free to adopt *more restrictive* legislation, or no legislation at all, but not less restrictive legislation." (Sen. Rep. at p. 2187; italics added.) In other words, "Congress left room for the states to supplement the law in certain areas, provided the regulations are not more permissive." (*Halpin* v. *Superior Court, supra,* 6 Cal.3d at pp. 898-899, fn. omitted; see also *State* v. *Siegel* (1972) 266 Md. 256 [292 A.2d 86, 94].)[12]

In forbidding wiretapping by persons other than law enforcement officers except where all parties to a communication give their consent, section 631 fulfills federal objectives. Although Congress has declared that one of its purposes in enacting title III was to establish uniform, nationwide standards, this purpose, as we have explained, must be viewed in the light of congressional intent to ensure nationwide compliance with the *Berger* and *Katz* decisions. Such compliance can be achieved where state statutes meet the minimum standards provided in the federal act. Section 631 not only meets those minimum standards but it also imposes a more restrictive rule in requiring the consent of all parties to a communication for its interception; and, the section serves to promote the federal objective of protecting the right of privacy. Accordingly, we are unable to conclude that the "fed-

---

[12]We observe that the state statute under consideration here does not *authorize* the interception of wire communications; rather, in effect, it *prohibits* the interception of wire communications. It is contended in this regard that the discussion in the Senate Report pertains only to the former, i.e., a state statute regulating warrant requirements. However, in indicating that a state system for authorizing warrants shall be permitted, title III and the Senate Report implicitly recognize that the states may also prohibit the interception of communications. Further, since the Senate Report explicitly declares that state standards governing the issuance of warrants may be more restrictive, it follows that state standards prohibiting the interception of communications may be equally limiting.

We do not intend to imply, however, that a state prohibitory statute which is less restrictive is necessarily in conflict with the federal law. It is doubtful that such a statute would frustrate the purposes of title III since, unlike a state statute authorizing an interception under circumstances not allowed by the federal enactment, a less restrictive prohibitory statute obviously would not permit what is prohibited by federal law, but would merely fail to punish conduct which is in contravention of federal law.

eral superintendence of the field" (*Florida Avocado Growers* v. *Paul, supra,* 373 U.S. at p. 142 [10 L.Ed.2d at p. 257]) is impaired in any manner.[13]

Having found no intent by Congress to occupy the entire field involving the interception of communications nor any conflict between title III and section 631 that would require the latter to yield under the supremacy clause, we hold that this state is free to enforce the proscription of section 631.

The judgment of dismissal is reversed and the cause remanded to the trial court with directions to overrule the demurrer.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Clark, J., concurred.

Respondent's petition for a rehearing was denied July 25, 1974.

---

[13]At the same time we express no opinion on the issue whether a state may criminally prosecute a federal agent for violating state law where he has obtained and executed a warrant in compliance with title III. (See generally, Comment (1969) 64 Nw.U.L.Rev. 63.) The issue present here has been described as the "only major conflict between the two statutes." (Note, *supra,* 57 Cal.L.Rev. 1182, 1210.) On the other hand, it has been held that evidence obtained pursuant to a federal warrant authorizing a wiretap but not in compliance with California law is not admissible in a California state court. (*People* v. *Jones* (1973) 30 Cal.App.3d 852, 855 [106 Cal. Rptr. 749], app. dism. in *California* v. *Jones,* 414 U.S. 804 [38 L.Ed.2d 40, 94 S.Ct. 163], for lack of a "substantial federal question.")