UNITED STATES of America,
Plaintiff-Appellee,

v.

James Joseph TESTA,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Edward EPSTEIN, Defendant-Appellant.

Nos. 75–3316 and 75–3792.

United States Court of Appeals,
Ninth Circuit.

Feb. 22, 1977.

Ernest Y. Yamane, Bicoy & Yamane, Honolulu, Hawaii, for Testa.

William J. Eggers, III, Asst. U. S. Atty., Honolulu, Hawaii, for plaintiff-appellee.

Burton Marks, Beverly Hills, Cal., for Epstein.

Before ELY and TRASK, Circuit Judges, and ORRICK,* District Judge.

## OPINION

ORRICK, District Judge:

James Joseph Testa and Edward Epstein appeal from their convictions, after a jury trial, for conspiracy with intent to distrib-ute seven kilograms of heroin in return for $100,000 tribute money for assistance and protection in the transaction in violation of 21 U.S.C. § 846, and for knowing and intentional distribution of one kilogram of heroin in violation of 21 U.S.C. § 841(a)(1). The six co-defendants with whom appellants were indicted pleaded guilty to these or related charges.

The appellants make several assignments of error, objecting to the trial court's failure to strike testimony concerning acts and declarations occurring prior to or after the conspiracy charged; asserting that the court allowed the jury to consider the extrajudicial declarations of co-conspirators without sufficient evidence *aliunde* of the existence of the conspiracy and appellants' knowledge of and participation in it; contesting the admission into evidence of consensually monitored tapes of telephone calls of the informant and appellants, recorded by an undercover agent; and, as to Epstein alone, urging that the trial court's denial of his motion for change of venue constituted a deprivation of due process and a fair trial. For the reasons hereinafter stated, we affirm the judgments below.

## I.

The government based its case largely on the testimony of informant Jerry Ray, a convicted felon who received subsistence pay, a reward, and relocation expenses for his assistance. Ray met the two appellants in Los Angeles in July, 1973, when he attended two meetings arranged to discuss a heroin transaction. Testa attended only the first meeting and Epstein was present only at the second meeting. RT 21–22, 89, 130, 140. The deal never transpired because Ray and one Eckhart, who were acting as middlemen, learned that their ultimate purchasers were undercover police officers.

Ray began to cooperate with the government in late August or early September, 1973, after having been indicted for conspiracy. RT 28. In September, 1973, Ray con-

---

* Honorable William H. Orrick, United States District Judge, Northern District of California, sitting by designation.

tacted co-defendant Perrelli (Perri) in Las Vegas and asked whether the heroin deal was still available. Perri said that it was and telephoned John Lee in Honolulu. Ray also contacted co-defendant DeRosa, informing him that one Johnny Searing, actually Agent George Redden (hereinafter referred to as Searing/Redden), was interested in purchasing heroin, and inquiring whether the heroin was available and whose contact Lee was. DeRosa said that the heroin was available, that Searing/Redden should be checked out further, and that the contact was his, not Perri's. RT 33.

Approximately one week later, Ray met with Epstein in Las Vegas. Epstein advised that, according to DeRosa, the transaction could take place but that Searing/Redden should be investigated. At a subsequent meeting toward the end of September, DeRosa told Ray the price per kilogram; Epstein was present but took no part in the conversation. In early October, 1973, Ray and Searing/Redden went to Honolulu to discuss the transaction with Lee, who confirmed the price of the heroin. Ray and Searing/Redden were to return to Los Angeles and await the arrival of an initial shipment of heroin which Lee had agreed to front to Searing/Redden. The shipment did not arrive. Thereafter, Ray met with DeRosa and Testa. DeRosa informed Ray that tribute must be paid to the Los Angeles organization for any heroin brought into the area. He told Ray to advise Searing/Redden of this fact and to notify Testa of his response. Later that day, Ray called Testa and informed him that Searing/Redden was balking at the tribute demand. The conversation was recorded with Ray's consent.

DeRosa, Testa and Ray met the next afternoon pursuant to directions relayed to Ray by Testa. DeRosa inquired as to the amount of heroin involved. When Ray mentioned to DeRosa that Searing/Redden was hesitating about the tribute payment, DeRosa and Testa asked to see him. After Ray summoned him, DeRosa and Searing/Redden conversed, with Ray and Testa walking behind and able to hear, according

to Ray, "[j]ust a little" of the conversation. RT 50.

Ray and Perri traveled again to Hawaii, obtained a heroin sample from Lee for Searing/Redden (which was first turned over to a Dallas DEA agent and then analyzed in Kansas City), and returned to the mainland. Following further arrangements, Epstein contacted Ray and scheduled a meeting, at which Epstein told Ray that if a transaction had taken place, there was tribute to be paid. Epstein also said that DeRosa felt Lee and Searing/Redden were trying to deal without paying the tribute. RT 62.

Late in November or early in December Ray called DeRosa. Epstein came on the line and gave Ray a "clean number" (a pay telephone number or one known to have no government wiretap on it). (Epstein testified that when he was notified of court-authorized wiretaps at DeRosa's offices, DeRosa explained that he was under federal investigation. Epstein said he believed the investigation was for some sort of gambling charges.) The subsequent conversation, between Ray and Epstein, was taped with Ray's permission. Another meeting resulted from the conversation, this time with Searing/Redden, Ray, DeRosa and Epstein. Searing/Redden told DeRosa that he did not feel he should pay the tribute, asserting that he was from Kansas City and owed nothing to the Los Angeles faction. He also questioned Lee's ability to deliver the quantity of heroin discussed. DeRosa stated again that there would be no transaction anywhere without tribute and said that the Los Angeles faction had strong ties in the Kansas City area. Epstein affirmed DeRosa's influence in Kansas City.

In mid-December, Searing/Redden and Lee arranged in a taped conversation, at which Ray was present with Searing/Redden, for Searing/Redden to come to Hawaii with his money to consummate the transaction. Searing/Redden subsequently went to Hawaii, obtained two kilograms of heroin from Lee, and arrested Lee and his cohort Kaulia. The mainland defendants were unaware of the arrest. On January 10, 1974,

DeRosa and Ray spoke on the telephone; Ray said that the deal had transpired and that he was prepared to deliver the tribute money ($100,000). DeRosa said that the money could be delivered either to Los Angeles or to Kansas City. The conversation was recorded by Searing/Redden with Ray's permission.

On January 12, Milano and Ray spoke (and Searing/Redden, with Ray's permission, recorded the conversation) about plans for delivery of the tribute. The DEA surveilied the scene and photographed one of the co-defendants, Eugene Williams, waiting outside the designated location for the tribute money.

With the exception of the issue concerning the denial of Epstein's motion for change of venue, the issues raised on appeal are in all pertinent respects common to both appellants. We will address the common issues first.

## II.

Both appellants contend that motions to strike testimony concerning the two July, 1973, meetings, the first attended by Testa and the second by Epstein, should have been granted. Appellants point to the fact that this earlier plan was abandoned and was not part of the conspiracy for which appellants were indicted.

■ This contention rests on two distinct rules, neither of which mandated that the testimony be stricken. The first is that acts not part of the conspiracy charged may not be used as evidence that the accused committed the acts charged in the indictment. *See* Fed.R.Evid. 404(b). The government correctly responds that the evidence of July activity was introduced for purposes specifically permitted under the federal rule: to show motive, opportunity, intent, plan, scheme, knowledge, *modus operandi,* or absence of mistake or accident.[1] *See* Fed.R. Evid. 404(b); *United States v. Castro,* 476 F.2d 750, 753 (9th Cir. 1973); *United States v. Nunez,* 483 F.2d 453, 455–456 (9th Cir. 1973), *cert. denied* 414 U.S. 1076, 94 S.Ct. 594, 38 L.Ed.2d 483 (1973).

■ Similarly, acts by others (and statements by others, if not offered for the truth) before or after the conspiracy may be relevant in suggesting the existence and aims of the conspiracy charged. *United States v. Costello,* 352 F.2d 848 (2d Cir. 1965), *cert. granted on another issue* 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 205 (1965); *see Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *United States v. Wentz,* 456 F.2d 634, 637 (9th Cir. 1972).

■ The second rule on which appellants rely is that hearsay statements of co-conspirators are inadmissible against others unless made in furtherance of the conspiracy charged. *See Krulewitch v. United States,* 336 U.S. 440, 442–443, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (hearsay declaration made if at all after objective of conspiracy had either failed or been achieved not admissible on theory that was made in furtherance of alleged conspiracy). Again, the statement of the rule is accurate, but the rule does not necessitate exclusion of the evidence to which appellants object.

■ The statements in question were admissible for a non-hearsay purpose—to show that the parties who made the statements met and had a discussion. *See Anderson v. United States,* 417 U.S. 211, 219– 221, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). Moreover, as indicated above, the July statements of co-conspirators were admissible to show *their own* knowledge, motive,

---

1. Consistent with the government's response are the trial court's instructions. The court made it abundantly clear, referring to "the July events", that evidence that a defendant might have committed a prior act of a similar nature may not be considered in determining whether a defendant did an act charged in the indictment. Moreover, the court explained that the prior events could not be considered for any purpose unless the jury first found beyond a reasonable doubt that the accused did the act charged. If this finding was made, the court said, the jury could consider the past acts if proved by "clear and conclusive" evidence and could (but was not obliged to) draw the inference therefrom that a defendant did the act charged with specific intent (*i. e.,* absence of accident, mistake, etc.). *See* RT 582–583.

and absence of mistake, even though such statements were not probative of their commission of the conspiracy charged.

Finally, the trial court, demonstrating an abundance of caution, instructed the jury that "statements of any conspirator, which are not in furtherance of the conspiracy, or were made before its existence, or after its termination, may be considered as evidence only against the person making them". RT 576.

▮ Appellants also object to the use of statements of co-conspirators made after Lee's arrest in Hawaii on December 21, 1973. Specifically, Epstein objects to recordings of telephone conversations in January, 1974, involving informant Ray and co-conspirators DeRosa and Milano; he contends that delivery and seizure of the heroin, along with Lee's arrest, ended the conspiracy, as its goal had been accomplished.

This contention, too, is without merit. First, the conspiracy had not ended. An integral element of the scheme involved the payment of tribute money, and the conversations dealt specifically with arrangements for such payment. Second, the co-conspirators on the mainland were unaware that Lee had been arrested. RT 76. It has been held in comparable circumstances that statements made by co-conspirators who were unaware of the arrest of one of their group and intended to further the conspiracy are admissible under the conspiracy exception to the hearsay rule. *United States v. Bennett*, 409 F.2d 888, 893–894 (2d Cir. 1969). Similarly, this Circuit has held that while the acts and declarations of a co-conspirator after his arrest

"* * * 'do not bind, and may not be introduced against, other co-conspirators * * * the converse is not true. An unarrested co-conspirator still operating in furtherance of the conspiracy may say and do things which may be introduced against the arrested one if the conspiracy is still in operation.'" *United States v. Payseur*, 501 F.2d 966, 973 (9th Cir. 1974), quoting *United States v. Wentz, supra,* 456 F.2d at 637.

*A fortiori,* such acts and statements are admissible against an *unarrested* co-conspirator.

▮ Moreover, as suggested above, even if a conspiracy has terminated, evidence of subsequent acts may be admitted "to elucidate the nature of the prior conspiracy." *United States v. Trotter,* 529 F.2d 806 (3d Cir. 1976), citing *Anderson v. United States,* 417 U.S. 211, 219, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974); *United States v. Payseur, supra,* 501 F.2d at 973; *United States v. Wentz, supra,* 456 F.2d at 637.

### III.

▮ The second issue in common concerns the firmly established rule that out-of-court declarations of a co-conspirator may be introduced against a defendant only after evidence from a source apart from the statement (proof *aliunde* ) establishes "(1) that a conspiracy existed, and (2) that the member against whom the conversation is introduced had knowledge of and participated in the particular conspiracy alleged." *United States v. Ledesma,* 499 F.2d 36, 40 (9th Cir. 1974); *see Glasser v. United States,* 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Spanos,* 462 F.2d 1012, 1014 (9th Cir. 1972) (other citations omitted). Both Epstein and Testa invoke the rule, asserting that there is insufficient proof *aliunde* and that, therefore, statements of co-conspirators could not be used to establish their guilt.

▮ Initially, it should be noted that the order of proof is within the discretion of the trial judge, and that he may, as the trial court did here, "admit the evidence as to all defendants, subject to a motion to strike if not connected up with all or certain defendants." *United States v. Knight,* 416 F.2d 1181, 1185 (9th Cir. 1969).

A further question, however, concerns the weight of the proof required to withstand a motion to strike. While there is some variation among the courts of appeals as to the quantum of proof *aliunde* necessary before co-conspirators' declarations may be sub-

mitted to the jury,[2] we have required that there be substantial independent evidence of the conspiracy sufficient to sustain a finding (*i. e.*, to establish a *prima facie* case of the conspiracy and the defendant's knowledge of and participation in it). *See United States v. Spanos, supra,* 462 F.2d at 1014; *Carbo v. United States,* 314 F.2d 718, 737 (9th Cir. 1963); *United States v. Calaway,* 524 F.2d 609, 612 (9th Cir. 1975); *United States v. Randall,* 491 F.2d 1317, 1320 (9th Cir. 1974).[3]

■ Several corollaries accompany this standard. First, we have held that the independent evidence need not be direct evidence. *See, e. g., United States v. Turner,* 528 F.2d 143, 162 (9th Cir. 1975) (common plan or scheme may be inferred from circumstantial evidence); *United States v. Randall, supra,* 491 F.2d at 1320 (independent evidence of illicit association may be totally circumstantial). Second, we have often stated that once a conspiracy is shown to exist, only slight evidence is required to connect a co-conspirator. *United States v. Turner, supra,* 528 F.2d at 162 (citing various decisions of this Circuit).[4] Naturally, as we have recently emphasized,

" * * * the 'slight' evidence must be of the quality which will reasonably support a conclusion that the particular defendant in question wilfully participated in the unlawful plan with the intent to further some object or purpose of the conspiracy." *United States v. Freie,* 545 F.2d 1217 at 1222 (9th Cir. 1976).

■ Both appellants contend chiefly that there was inadequate independent evidence of their active participation in the conspiracy. *See United States v. Webb,* 359 F.2d 558, 562 (6th Cir. 1966); *Ong Way Jong v. United States,* 245 F.2d 392, 394 &

2. The Courts of Appeals for the Second and Third Circuits have used a stringent test for letting the evidence go to the jury, requiring that the prosecution prove participation in the conspiracy by the defendant against whom the hearsay is offered by a *fair preponderance* of the evidence independent of the hearsay utterances. If the prosecution fails, the court must instruct the jury to disregard the declarations admitted subject to connection or, in appropriate circumstances, declare a mistrial. *See United States v. Geaney,* 417 F.2d 1116 (2d Cir. 1969). In *United States v. Trotter,* 529 F.2d 806 (3d Cir. 1976), the court spoke of the adoption by the Third Circuit of the *Geaney* "fair preponderance of the evidence test", *contrasting* this test with the tests used by the Fourth, Sixth, Seventh, Eighth, and Ninth Circuits, which require only "prima facie proof" of a conspiracy. The court in *Trotter* noted that the Supreme Court in *United States v. Nixon,* 418 U.S. 683, 701 n. 14, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974), stated in regard to proof *aliunde* that:

"* * * As a preliminary matter, there must be substantial, independent evidence of the conspiracy, at least enough to take the question to the jury. Whether the standard has been satisfied is a question of admissibility of evidence to be decided by the trial judge." (Citations omitted.)

For this proposition, the Supreme Court cited cases of the five circuits above which, according to the court in *Trotter,* use the "prima facie proof test". The Ninth Circuit cases cited were *United States v. Spanos,* 462 F.2d 1012, 1014 (9th Cir. 1972), and *Carbo v. United*

*States,* 314 F.2d 718, 737 (9th Cir. 1963), *cert. denied* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). See text, *supra.*

3. Our statement in *United States v. Randall,* 491 F.2d 1317, 1320 (9th Cir. 1974), that the sufficiency to sustain a finding test was a threshold requirement and that it may subsequently appear that the independent evidence is insufficient to submit the issue of defendant's alleged guilty involvement with the declarant to the jury should not be seen as a departure from the "sufficiency to sustain a finding" standard, nor should it be viewed as an effort to engraft the more rigorous standard developed in the Second and Third Circuits onto our standard. In any event, the trial court in the present case instructed the jury that statements and acts of co-conspirators in furtherance of the conspiracy could be considered as to the defendants if it appeared "beyond a reasonable doubt * * * that a conspiracy existed, and that a defendant was one of the members * * *". RT 575–576. Thus, the court was unduly generous to appellants here. *See United States v. Knight,* 416 F.2d 1181, 1186 (9th Cir. 1969).

4. It should also be noted incidentally that the requirements regarding hearsay declarations of co-conspirators apply not to testimony about the acts and declarations of the accused himself, but only to the use of declarations and acts of one co-conspirator against the other. *Klein v. United States,* 472 F.2d 847, 850 (9th Cir. 1973).

n. 2 (9th Cir. 1957). As to each defendant, active participation was sufficiently established. Such evidence, combined with evidence adequately showing existence of the conspiracy and appellants' knowledge of its existence, constituted evidence *aliunde* sufficient to permit co-conspirators' declarations to be submitted to the jury.

### A.

Epstein states that evidence *aliunde* established only that he was present as a bystander and took messages to co-conspirators; he asserts that he had "no stake in the venture", took no part in arranging the heroin purchase, and was not to receive the tribute money.

The fact of conspiracy and Epstein's knowledge of it are clearly established by evidence of his presence at meetings with co-conspirators, including a meeting at which the price of the heroin was discussed (RT 35), and of his arranging of meetings. In addition, testimony revealed several acts which demonstrate his participation in the scheme. Ray stated that Epstein had told him in September, 1973, that the "deal could come down" and that he should look further into Searing/Redden. RT 152. Ray also testified that Epstein called him and arranged a meeting between the two men alone at which he said that if a heroin transaction had taken place, there was tribute money to be paid. At the same meeting, Epstein conveyed the message that DeRosa felt Lee and Searing/Redden were trying to deal without paying the tribute money. RT 61–62. On another occasion, Epstein reiterated DeRosa's statement that the deal would not be consummated without the payment of tribute. RT 158–160. Similarly, Epstein supported DeRosa's comments to Searing/Redden about DeRosa's strength in Kansas City. RT 68 (Ray), 303 (Searing/Redden). Finally, Ray testified that Epstein contacted him in late November or early December to inquire about the

progress of the deal and to say that DeRosa was anxious for the tribute. RT 176–177.[5]

Epstein's argument that he had nothing to gain is unconvincing, both because he does not consider intangible rewards for proving himself a capable messenger and, more important, because gain to each individual conspirator is not an essential element of conspiracy. *See, e. g., United States v. Jit Sun Loo*, 478 F.2d 401, 407 (9th Cir. 1973). Moreover, even a finding that Epstein merely communicated messages would not preclude a finding of complicity. In *United States v. Randall, supra*, 491 F.2d at 1320, we noted that an inference of complicity may be drawn from mere presence at the scene, if the accused is likely to be aware that an offense is to be committed, and if such presence either facilitates or permits the offense.

### B.

The government points both to Testa's fraternization with co-conspirators at meetings held for the sole purpose, according to Ray, of discussing the heroin transaction, and to his initiation of telephone calls. As with Epstein, the testimony is decidedly sufficient to establish existence of the conspiracy and Testa's knowledge of its existence. Testa urges, however, that all evidence *aliunde* relates only to the tribute money payment. He contends that, therefore, there is no independent proof of his participation in a conspiracy to distribute heroin. This appellant's argument, too, is without merit.

The principal independent evidence of Testa's participation concerns events occurring on October 5 and 6, 1974. On October 5, Ray testified, Testa and DeRosa met with him. As stated above, DeRosa told Ray that tribute would be required for heroin brought into the Los Angeles area, that Ray should so inform Searing/Redden, and that Ray should report the results to Testa. RT 44. Ray accordingly called Testa, told

5. Epstein and John Perrelli (Perri) contradicted some of the above testimony. The jury, naturally, weighted the credibility of the various witnesses. Moreover, the trial court cautioned the jurors to weigh the testimony of a possibly prejudiced informant more carefully than that of an ordinary witness. RT 589.

him Searing/Redden was balking about the payment of tribute, and stated that the heroin was going to the Kansas City area. RT 45. Later, Testa gave Ray instructions to meet the next afternoon. The quantity of heroin desired and the tribute were discussed at the meeting, both DeRosa and Testa asking to see Searing/Redden after learning again that he was hesitant to honor the tribute demand. RT 49–50; *see* RT 208–209.

■■■ As to Testa's assertion that the independent evidence against him concerns only the tribute demand, which actually hindered rather than facilitated the consummation of the deal, there are two dispositive responses. First, Testa's arranging of and presence at meetings at which the heroin sale was discussed, combined with his knowledge of the transaction, would permit an inference of complicity, as his actions facilitated the conspiracy. *See United States v. Randall, supra*, 491 F.2d at 1320. Second, it must be emphasized that the tribute payment was a crucial, integral part of the conspiracy. The fact that Testa directly participated in some aspects of the plan rather than others does not detract from his responsibility for the enterprise. A party to a conspiracy is liable for the acts of his co-conspirators in furtherance of the conspiracy (*Pinkerton v. United States*, 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)) even if he is unaware of the existence of the acts or the actors. *United*

States v. Roselli*, 432 F.2d 879, 894 (9th Cir. 1970); *see United States v. Friedman*, 445 F.2d 1076 (9th Cir. 1971).

Testa's related assertion that he cannot be guilty of the possession count since his involvement, if any, was limited to the tribute demand, must fail for the same reasons. If the evidence is sufficient to support a guilty verdict as to the conspiracy, and if the acts are in furtherance of the conspiracy and committed by one or more members of a conspiracy, a co-conspirator may be found guilty of a substantive offense in which he does not participate. *See Pinkerton v. United States, supra*, 328 U.S. at 645–648, 66 S.Ct. 1180 (1946).

IV.

■■ Both appellants take issue with the admission into evidence of conversations recorded with the consent of one party. Specifically, Epstein objects to the government's use of telephone conversations between informant Ray and defendants Epstein, DeRosa, Milano, and Perri, which were recorded by Searing/Redden with Ray's consent.[6]

This contention is decidedly without merit. This Circuit has held explicitly that "one party's consent is sufficient justification for electronic surveillance and no prior judicial authorization is required". *United States v. Ryan* (9th Cir., May 24, 1976), 548 F.2d 782 at 787; *see Holmes v. Burr*, 486 F. 2d 55 (9th Cir. 1973); 18 U.S.C. § 2511(2)(c).[7]

---

**6.** The government stated that Testa did not file a motion to suppress in the trial court, although he may have joined orally in other defendants' motions. In view of our determination that such a motion lacks merit, we need not decide whether or not Testa properly raised the issue below. It should also be noted that Epstein did not distinguish objections to conversations to which he was a party from those engaged in by others. *See United States v. King*, 478 F.2d 494 (9th Cir. 1973), *cert. denied*, 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 94 *sub nom. Light v. United States*:

"* * * a defendant may move to suppress the fruits of a wire-tap only if his privacy was actually invaded, that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premises. *Alderman v. United States, supra*, 394

U.S. 165 at 176, 89 S.Ct. 961, 22 L.Ed.2d 176." 478 F.2d at 506.

**7.** 18 U.S.C. § 2511(2)(c), part of the Omnibus Crime Control and Safe Streets Act (18 U.S.C. §§ 2510–2520) provides:

"It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

In *Holmes v. Burr*, 486 F.2d 55 (9th Cir. 1973), we noted that while this provision specifically authorized consensual interception, reference to the measure was unnecessary to disposition of the case, as we were bound by the decision in *United States v. White*, 401 U.S. 745, 91

Appellant Epstein argues that because California and Nevada statutes require the consent of *all* parties (*see* Cal.Pen.Code § 631; Nev. NRS §§ 200.610–200.690), and because the federal statute was not intended to preempt more restrictive state laws, the evidence gathered should not be admissible in federal court.

In *United States v. Keen*, 508 F.2d 986, 989 (9th Cir. 1974), *cert. denied* 421 U.S. 929, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975), we found that "wire-tap evidence obtained in violation of neither the Constitution nor federal law is admissible in federal courts, even though obtained in violation of state law". In reaching this conclusion, we noted that Section 2511(2)(c) does not necessarily preempt more rigorous state laws, but stated that "[w]here no constitutional right has been abused, the admissibility of evidence is governed by common law principles, not by local statute". 508 F.2d at 988–989. As to the question of constitutionality, we found that "[w]iretaps obtained with the consent of one party to a conversation do not violate the fourth amendment". 508 F.2d at 989. In addition, we noted that "[a]t common law, evidence was admissible regardless of its illegal origins". 508 F.2d at 989.

More recently, in *United States v. Hall*, 543 F.2d 1229 (9th Cir., 1976), we considered at length the question of the more stringent California statute and the likelihood that such statutes were not preempted by the federal law (*see People v. Conklin*, 12 Cal.3d 259, 114 Cal.Rptr. 241, 522 P.2d 1049 (1974); *People v. Jones*, 30 Cal.App.3d 852, 106 Cal. Rptr. 749 (1973)), concluding once again that regardless of their viability as state laws, these state provisions do not govern the question of admissibility in federal court. 543 F.2d at 1234–1235. In the present case, the evidence was gathered in accordance with federal law and was thus

admissible, even if its acquisition violated state law. *United States v. Keen, supra,* 508 F.2d at 989; *United States v. Hall, supra,* at 1235.

## V.

■ Defendant Epstein objects that he was deprived of due process and a fair trial by the district court's denial of his motion for a change of venue. He urges that the only two defendants who went to trial resided in the Central District of California, the overt acts committed in furtherance of the conspiracy by the remaining co-defendants were committed in the Los Angeles or Las Vegas area, the costs of traveling to Hawaii and living there precluded him from producing witnesses from Los Angeles on his behalf, and the government would not have been inconvenienced by the change of venue.

Rule 21(b) of the Federal Rules of Criminal Procedure provides:

> "*Transfer in Other Cases.* For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to him or any one or more of the counts thereof to another district."

It has frequently been held that determination of a Rule 21(b) motion involves the sound discretion of the trial court, and that a party urging reversal must assume the burden under Rule 52(a) of the Federal Rules of Criminal Procedure "of demonstrating that some substantial right has actually been affected". *United States v. Phillips*, 433 F.2d 1364, 1368 (8th Cir. 1970).

While it seems that the motion might at least arguably have been granted upon an adequate showing (*see Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964) (factors

S.Ct. 1122, 28 L.Ed.2d 453 (1971). The court in *White* said:

"* * * If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the

same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks." 401 U.S. at 751, 91 S.Ct. at 1126.

pertinent to propriety of transfer)), the trial court did not abuse its discretion in refusing to grant the motion.

First, Epstein did not carry the burden of demonstrating his need for transfer. *See Jones v. Gasch*, 131 U.S.App.D.C. 254, 404 F.2d 1231, 1243 (1967). He offered no specific examples of efforts to contact or obtain witnesses or of failure because of lack of funds. He did not make any attempt to subpoena witnesses, nor did he indicate specifically who the witnesses were to be or the nature of their expected testimony, other than to state that they were character witnesses. *See Lindberg v. United States*, 363 F.2d 438 (9th Cir. 1966). While Rule 21(b) contemplates minimization of inconvenience to the defense, it has been recognized that some degree of inconvenience is inevitable, and that the government's inconvenience must be considered as well. *See Jones v. Gasch, supra*, 131 U.S.App.D.C. 254, 404 F.2d at 1241. In this regard, we must consider the fact that Epstein moved for change of venue only eight days before trial. *See United States v. Polizzi*, 500 F.2d 856, 901 (9th Cir. 1974) (proper to require greater showing of inconvenience when transfer sought late in proceedings). Moreover, transfer of Epstein's trial would have severed the two defendants' trials. *See United States v. United States Steel Corporation*, 226 F.Supp. 152, 157 (S.D.N.Y.1964).

AFFIRMED.