**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Clara Bell HALL, Defendant-Appellant.**

No. 73–2826.

United States Court of Appeals, Ninth Circuit.

Aug. 31, 1976.

Certiorari Denied Jan. 25, 1977. See 97 S.Ct. 814.

Allan B. Streller (argued), of Silver, Streller & Wells, Los Angeles, Cal., for defendant-appellant.

Jerry L. Newton, Asst. U.S. Atty. (argued), Los Angles, Cal., for plaintiff-appellee.

Before CHAMBERS, KOELSCH, BROWNING, DUNIWAY, ELY, HUFSTEDLER, WRIGHT, TRASK, CHOY, GOODWIN, WALLACE, SNEED and KENNEDY, Circuit Judges.

CHOY, Circuit Judge:

Clara Bell Hall appeals from a conviction for possession of heroin in violation of 21 U.S.C. § 844(a). Her appeal presents the question of the admissibility in federal court of evidence seized pursuant to an arrest by California officers when that arrest was based on the state agents' use of information gathered by wiretaps authorized under federal law but illegal under California law. We affirm, holding such evidence to be admissible.

## Backround

On February 6, 1973, California state officers approached an automobile driven by James Kirkpatrick Cooper, in which Hall was a passenger, after the car had stopped at a service station near Fresno. After asking the occupants to get out, one officer noticed a strong acetic acid smell coming from Hall's purse. Based on his seven years as a narcotics agent, he identified this smell with heroin. A subsequent search of the purse revealed that it contained narcotics paraphernalia and approximately 51 grams of heroin, which was seized and later admitted into evidence at Hall's trial. No warrant had been issued for the stop or the search.

The state officers approached Cooper's car because they had been informed earlier that day by federal agents in Los Angeles that an individual believed to be Cooper, together with a female who turned out to be Hall, were en route to Fresno via Highway 5 in a white and black Cadillac with a given license number, and that Cooper had placed an order for heroin and cocaine prior to leaving Los Angeles and was believed to be in possession of contraband on the trip. The information supplied the California officers was obtained from a duly authorized federal wiretap, the legality of which is not in question here,[1] and from surveillance of Cooper by federal agents prompted by the wiretap disclosures.

Prior to trial Hall moved unsuccessfully to suppress the evidence seized at the time of her arrest. She contends that the district court erred in not excluding the heroin on the ground that the arrest, search, and seizure were accomplished by state officers in violation of state law.

## Hall's Argument

Hall argues that the wire interception involved here was unlawful under California Penal Code § 631, that the use by state officers of information obtained by the wiretap was also in violation of the statute, and thus that the arrest and sei-

zure, as fruits of the wiretap, were illegal and evidence therefrom was inadmissible under California law.

It is conceded that California prohibits wiretapping and the use of any information so obtained, and such evidence is inadmissible in California state court proceedings. California Penal Code § 631, adopted in 1967, provides, in part:

> (a) *Prohibited acts; punishment; recidivists.* Any person who . . . intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire . . . or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . is punishable by a fine . . . or by imprisonment . . . or by both . . . . .
>
> *  *  *  *  *  *
>
> (c) *Evidence.* Except as proof in an action or prosecution for violation of this section, no evidence obtained in violation of this section shall be admissible in any judicial . . . proceeding.

The wiretapping which led to Hall's arrest was conducted by federal agents with a proper warrant under the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* Nonetheless, the California courts have held that this federal statute does not entirely preempt the state prohibition. Thus, a wiretap conducted by federal officers and authorized pursuant to the federal statute has been held to be "unlawful" under California's § 631 and the evidence from it has been ruled inadmissible in California court proceedings. *People v. Jones*, 30 Cal. App.3d 852, 106 Cal.Rptr. 749 (1973), *appeal dismissed for want of substantial federal question*, 414 U.S. 804, 94 S.Ct. 163, 38 L.Ed.2d 40 (1973); *see People v. Conklin*, 12 Cal.3d 259, 114 Cal.Rptr. 241, 522 P.2d 1049 (1974), *appeal dismissed for want of substantial federal question*, 419 U.S. 1064, 95 S.Ct. 652, 42 L.Ed.2d 661 (1974); *Halpin v.*

---

1. *See United States v. Turner*, 528 F.2d 143 (9th Cir. 1975). The interception which ulti-

mately led to Hall's arrest was one of the wiretaps reviewed in *Turner.*

*Superior Court*, 6 Cal.3d 885, 101 Cal.Rptr. 375, 495 P.2d 1295 (1972), *cert. denied*, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972).

Because of the provisions of the California law, Hall argues, the state agents acted illegally in arresting her, since the motivation and justification for doing so came from wiretap evidence which the state officers could not lawfully use. And, she contends, according to *United States v. Di Re*, 332 U.S. 581, 589, 68 S.Ct. 222, 226, 92 L.Ed. 310 (1948), the illegality is recognized in federal courts as well, since "in absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity." Thus, she concludes, the heroin must be suppressed since it was seized without a warrant and not pursuant to a lawful arrest.

We reject the urging to apply *Di Re* for two reasons: we perceive Title III to represent "an applicable federal statute," and we do not believe that *Di Re* is meant to apply to a case such as this. In addition, we conclude that the federal court is not compelled to exclude the seized material merely because of a violation of state law. We thus affirm Hall's conviction.

### Title III as an "Applicable Federal Statute"

The *Di Re* doctrine applies only in the absence of a relevant federal law. On the subject of wiretapping, however, federal law is not silent. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, authorizes the interception, disclosure, and admission into evidence of wire communications in certain circumstances and pursuant to several safeguards, including a requirement for a warrant. It is conceded that the interception that led to Hall's arrest was sanctioned by this federal statute. The admissibility of the contents of the intercepted communications, including the one that produced the information about Cooper, into evidence in federal court is also unquestioned. *See* § 2517(3). We recognize that a California court would exclude the contents and would also prohibit evidence derived therefrom as

fruit from the poisonous tree of wiretapping. But under the federal statute this wiretapping is not poisonous to a federal court, so its fruits should not be poisonous, either.

It may well be true, as the California courts have held, that the federal act does not preclude the states from enacting more restrictive wiretapping statutes of their own. To the extent that there is a conflict between the state and federal legislation, though, the federal statute controls under the Supremacy Clause of the Constitution, Article VI, cl. 2. The state law cannot preempt the federal unless the federal act itself sanctions the application of state standards. That is not the case here. Federal officers are authorized to wiretap under § 2516(1), regardless of the provisions of state law; it is only wiretapping by state officers under § 2516(2) which requires further authorization by state statute. Section 2515 requires the exclusion of wiretap evidence from any court proceeding if its disclosure would violate the federal act; no mention is made of any state law. The legislative intent that federal law is to prevail in case of conflict is further indicated by § 2520, which provides:

A good faith reliance on a court order or legislative authorization shall constitute a complete defense to any civil or criminal action brought under this chapter *or under any other law.* [Emphasis added.]

With the lone exception concerning interception by state officers for state prosecutions, the federal statute does not defer to the states.

Indeed, it even appears that the federal statute affirmatively authorizes this kind of disclosure of the wiretap information to and use of it by state agents, in § 2517(1) and (2):

(1) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure

is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

(2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties.

The California agents are "investigative or law enforcement officers" as that term is defined by § 2510(7).

Hall contends that the state's prohibition against the use of the wiretap evidence renders such use by its officers not "appropriate to the proper performance of [their] official duties." Assuming, without deciding, that this is an accurate reading of state law, we believe that the qualifying phrase in § 2517(1) and (2) was not intended to obliquely import state standards. Had that been the aim, Congress would have said so more clearly.[2] Instead, we view the phrase as designed to protect the public from unnecessarily widespread dissemination of the contents of interceptions and from the wholesale use of information gleaned from a legal wiretap by an officer—state or federal—for personal or illegal purposes.

By that measure, the involvement of the state officers here was not out of bounds. Possession of heroin is both a federal offense and a felony under California law.[3] California Penal Code § 836 empowers a peace officer to make an arrest without a warrant if he has "reasonable cause" to believe that the person has committed a

felony, a condition met here. Since the detention of Hall and the subsequent seizure of the heroin were within the proper performance of the officers' official duties, their use of the wiretap information was thus authorized by § 2517(2), at least in the eyes of federal courts.[4]

We conclude, therefore, that there is no occasion here to apply the *Di Re* doctrine of turning to state law to determine the validity of an arrest. That rule attaches only "in absence of an applicable federal statute," and as to wiretapping—the subject of the purported illegality under California law—there is a relevant federal enactment.

## The Di Re *Doctrine*

More fundamentally, we do not believe that the rule expressed in *Di Re* is even meant to apply to a case like this. The issue in *Di Re* concerned the quantity of evidence necessary for a warrantless arrest, not the source or admissibility of that evidence. *Di Re* was arrested without a warrant by a Buffalo, New York police officer, accompanied by a federal investigator who lacked the power to arrest, for a federal offense, knowing possession of counterfeit gasoline ration coupons. The evidence used to convict him—the ration coupons—was seized in a search after his arrest. The Government justified the search as having been pursuant to the arrest. The Court held that the arrest was not lawful, however, since the officer lacked the grounds necessary for making a legal arrest. Under New York law, a police officer could arrest a person without a warrant for a misdemeanor only if the offense was committed in the arresting officer's presence and for a

2. We note in contrast the clear expression in the legislative history of Congress's intent to encourage cooperation between federal and state law enforcement officers. According to the Senate Report, for instance, § 2517(1) "envisions close Federal, State, and local cooperation in the administration of justice." 1968 U.S. Code Cong. & Admin. News, p. 2188. Reading state restrictions into the "appropriate to the proper performance of his official duties" phrase in § 2517(1) and (2) would disrupt such cooperation and run counter to the expressed legislative intent.

3. For the California provisions, see Cal. Health & Safety Code §§ 11054(c)(10), 11350(a). Sections 11470–11471 of that Code authorize the seizure and forfeiture of heroin without a warrant if incident to an arrest.

4. We do not consider whether states may exclude from their own courts evidence obtained by such use.

felony only if the officer had reasonable grounds to believe that the suspect had committed the offense. It was this state standard which the Court applied to Di Re's arrest. In rejecting the Government's contention that arrests for federal offenses should be tested by a uniform federal rule, the Court observed that Congress had enacted no general federal law of arrest. Thus lacking any contrary federal legislation, the Court held that the quantum of knowledge required to permit a warrantless arrest was established by the state law granting the authority to make such an arrest.[5] No mention was made of judging the acceptability of the evidence by whether it would be admissible in the state's courts.

The decisions since which have applied the *Di Re* principle have similarly concerned the act of arrest itself and not the nature of underlying evidence. Most, like *Di Re*, have involved the quantum of information needed to justify an arrest or a temporary detention. *See United States v. Lovenguth*, 514 F.2d 96, 98 (9th Cir. 1975); *United States v. Walling*, 486 F.2d 229, 235 (9th Cir. 1973), *cert. denied*, 415 U.S. 923, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1974); *United States v. Branch*, 483 F.2d 955, 956 (9th Cir. 1973); *United States v. Fisch*, 474 F.2d 1071, 1075 (9th Cir.), *cert. denied*, 412 U.S. 921, 93 S.Ct. 2742, 37 L.Ed.2d 148 (1973); *Taylor v. Arizona*, 471 F.2d 848, 851 (9th Cir. 1972), *cert. denied*, 409 U.S. 1130, 93 S.Ct. 948, 35 L.Ed.2d 262 (1973); *United States v. Blum*, 432 F.2d 250, 252 (9th Cir. 1970); *Wartson v. United States*, 400 F.2d 25, 27 (9th Cir. 1968), *cert. denied*, 396 U.S. 892, 90 S.Ct. 184, 24 L.Ed.2d 166 (1969); *Dagampat v. United States*, 352 F.2d 245, 247 (9th Cir. 1965), *cert. denied*, 383 U.S. 950, 86 S.Ct. 1209, 16 L.Ed.2d 212 (1966); *also Johnson v. United States*, 333 U.S. 10, 15 n.5, 68 S.Ct. 367, 92 L.Ed. 436 (1948). A

few have concerned the mechanics of the arrest, as whether there had actually been an arrest—*see Call v. United States*, 417 F.2d 462, 464 (9th Cir. 1969)—or whether there had been compliance with state requirements of announcement before entry—*see United States v. Scott*, 520 F.2d 697, 700 (9th Cir. 1975); *also Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), at 37–41, 83 S.Ct., at 1631–1634 (opinion of Clark, J.) and 62, 83 S.Ct. 1644 (opinion of Brennan, J.); *Miller v. United States*, 357 U.S. 301, 305–06, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

■ Hall's objection is entirely different. She does not argue that the state agents lacked "reasonable cause" to detain her as required by California law or that they erred in the manner in which they carried out the arrest and search. Her complaint is that the state officers used impermissible evidence in forming the reasonable belief needed. It is not the state's arrest law which she cites, but its anti-wiretapping statute. That is not what *Di Re* is about. That decision does not compel federal courts to defer to state law as to the acceptability of evidence used to justify a warrantless arrest. It is, therefore, not pertinent to the case at hand.

### State Law and Federal Admissibility

■ Since *Di Re* is not applicable here and we are not required by it to exclude the evidence seized at the time of Hall's arrest, the case before us narrows to a basic question: whether evidence obtained by means in apparent violation of state law must be excluded in a federal court. We hold that such evidence is not necessarily inadmissible, and further that in the immediate case the district court did not err in accepting the evidence in question.

---

**5.** The Court was moved to turn to state law at least in part because the then-existing federal statute concerning arrests with warrants for federal offenses called for conformity with the given state's usual mode of process. 332 U.S. at 581–82, 68 S.Ct. 367. The current version of that statute is 18 U.S.C. § 3041, and it differs markedly. The standards for warrants issued by and proceedings before federal judges and magistrates are now set by the Federal Rules of Criminal Procedure, notably Rule 4. State law continues to have relevance for the limited range of activity permitted state judges and magistrates as to the detention and release of persons for federal offenses.

In reaching these conclusions we follow *United States v. Keen*, 508 F.2d 986 (9th Cir. 1974), *cert. denied*, 421 U.S. 929, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975), which, though not directly on point, states the view we believe to be proper here. In *Keen*, as here, the appellant's principal contention centered on the inadmissibility of wiretap evidence under state law. Without a warrant, a federal agent recorded a conversation between Keen and an informer, with only the latter's consent. Under the relevant Washington statute, a wiretap was illegal unless consented to by both parties, and we did not find this provision to be displaced by Title III. Though obtained in violation of state law, in *Keen* we held the evidence to be admissible in a federal prosecution. We noted that the exclusionary rule is a remedy which is integrally bound up with constitutional protections, including those of the fourth amendment, and found that we were not necessarily bound to extend it to evidence tainted under state law. With citations of the relevant authorities, we concluded:

> Where no constitutional right has been abused, the admissibility of evidence is governed by common law principles, not by local statute. . . . At common law, evidence was admissible regardless of its illegal origins. . . . Therefore, wiretap evidence obtained in violation of neither the Constitution nor federal law is admissible in federal courts, even though obtained in violation of state law. . . . [Citations omitted.]

508 F.2d at 989.

Hall's case presents the same situation. Her arrest and subsequent search were illegal under state law because they involved the use by state officers of material from a wiretap unlawful under state law. She concedes, however, that there was no infringement of constitutional proportions on her rights. The use of information from a duly authorized wiretap is not a violation of the fourth amendment, and the participation of state officers does not make it so. Nor, as our previous discussion has indicated, have we found exclusion of the wiretap evidence to be required by federal law. In the absence of any federal violation, therefore, we are not required to exclude the challenged material; the bounds of admissibility of evidence for federal courts are not ordinarily subject to determination by the states. We thus conclude that the district court did not err in admitting into evidence the heroin seized at the time of Hall's arrest.[6]

### Sufficiency of the Evidence

As a separate issue, Hall also challenges the sufficiency of the evidence to establish her knowing possession of the heroin. We find the evidence was sufficient. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

AFFIRMED.

DUNIWAY, Circuit Judge (concurring):

I concur in the judgment of affirmance, but for a different reason from those stated in Judge Choy's opinion. In my opinion, we need not reach the question of whether the arrest and the search of Hall's purse were illegal because based upon wiretap information which could not be used by state officers. Hall does not have standing to raise the issue.

At the suppression hearing, Agent Reyes, the federal agent who conducted the tap, testified as follows [RT, Vol. 7, pp. 57–70]: Four telephone calls bearing on this case were intercepted. Three were between one Cooper, the driver of the car in which Hall was arrested, and one Sandra Woodrow; the fourth was between a John Lewis and Sandra Woodrow. Hall's telephone was not tapped; no conversation in which she participated was intercepted.

---

**6.** *See also* the Supreme Court's recent decision in *United States v. Janis*, —— U.S. ——, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), where the Court refused to exclude from a federal civil proceeding evidence seized unconstitutionally, though in good faith, by state officers. This illustrates both the distinction made between "intersovereign" and "intrasovereign" use of unconstitutionally seized evidence and the Court's reluctance to extend the exclusionary rule.

Agent Miller, the Field Supervisor of the State Bureau of Narcotic Enforcement who led the arresting officers, testified that he received a phone call from Federal Agent Reyes telling him that based on a federal wiretap [RT 38], Reyes had reason to believe that one Cooper and an unidentified woman, who were traveling north on highway 99 in the vicinity of Fresno, were transporting substantial amounts of heroin and cocaine. Reyes asked Miller "to make an intercept." [RT 59] When the car was located, a surveillance was set up involving six or seven state cars. [RT 16] Cooper pulled into a gas station. The state vehicles deployed around the station, with red lights flashing, and two agents approached the Cooper car. [RT 17] When Cooper saw the agents, he jerked the car into gear and tried to speed away. His car only went ten feet, however, before it smashed into one of the state cars. [RT 17, 19] Miller asked both Cooper and the woman to get out. At that point Miller saw a purse lying partially open on the floor of the front seat. In the purse he saw a brown paper sack. [RT 19–20, 43–44] While reaching over to pick up the purse, but before actually touching it, Miller smelled a distinct acetic acid odor coming from the purse. [RT 20, 31, 43] Miller, trained and experienced in the detection of heroin, knew that this smell is generally associated with heroin. [RT 20–21, 22, 24, 31–33, 47–48] He opened the purse, took out the bag, opened the bag, and found that it contained heroin, among other things. He arrested both Cooper and the woman, who is Hall, on a state charge of felonious possession of heroin and cocaine. [RT 49]

Hall's argument is that the heroin should be suppressed. Her argument involves a series of contentions: (1) even though the wiretap was valid under federal law, the California officers could not use it; (2) therefore, Reyes, the federal officer, violated 18 U.S.C. § 2517 when he disclosed information obtained by the tap to the state officers; (3) therefore, the stop, the search, and arrest by the state officers were tainted by their knowledge of facts learned from the tap; (4) therefore, the heroin should be

suppressed as fruit of a tree which, though non-poisonous under federal law, is poisonous under state law.

It is a long standing rule in the federal courts that a person seeking to challenge the introduction of evidence on the ground that it was seized in violation of the Fourth Amendment must be a party against whom the search is directed. In *Jones v. United States*, 1960, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697, the Supreme Court held that:

> In order to qualify as a "person aggrieved by an unlawful search and seizure" one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else.

This doctrine has been more recently reiterated in *Brown v. United States*, 1973, 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208, and, as a constitutional matter, has been specifically applied to challenges against wiretap evidence in *Alderman v. United States*, 1967, 394 U.S. 165, 171–76, 89 S.Ct. 961, 22 L.Ed.2d 176.

As we have seen, however, Hall's argument does not rest upon the Fourth Amendment, but on a claim that it was a violation of Title III of the federal Omnibus Crime Control Act, and particularly § 2517, to disclose the fruits of the wiretap to state officers. Thus, the question we must confront is whether the standing principles of *Jones, Alderman,* and *Brown* which apply in cases involving constitutional challenges also apply in cases where the challenge is founded in Title III. I conclude that they do.

The cases which hold that only the targets of an unconstitutional search have standing to raise the issue of its validity rest on the notion that other persons are not "aggrieved" within the meaning of F.R. Crim.P., Rule 41(e). The only language in Title III of the Omnibus Crime Control Act which confers standing on anyone to raise

the issue of violation of the Act appears in 18 U.S.C. § 2518(10)(a), which reads:

> Any *aggrieved person* . . . may move to suppress the contents of any intercepted wire or oral communication, *or evidence derived therefrom*, on the grounds that—
>
> (i) the communication was unlawfully intercepted;
>
> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
>
> (iii) the interception was not made in conformity with the order of authorization or approval.
>
> (emphasis added)

The Supreme Court, referring to the legislative history of Title III, has noted that the standing requirements of Title III are the same as the existing standards for cases involving constitutional challenges. *Alderman v. United States, supra,* 394 U.S. at 175–76 n.9, 89 S.Ct. 961. *See* Senate Report No. 1097, 2 U.S. Code Cong. & Admin. News, pp. 2112, 2185 (1968). Various circuits have since held that anyone who challenges the validity of a search under Title III must either have been a party to the intercepted communication or the "owner" of the phone that was tapped. *United States v. Scasino,* 5 Cir., 1975, 513 F.2d 47, 50–51; *United States v. Capra,* 2 Cir., 1974, 501 F.2d 267, 281. *And see United States v. O'Neill,* 6 Cir., 1974, 497 F.2d 1020, 1025.

It is no answer to say that this rule does not apply to Hall because she is complaining about a violation of state law, not of Title III. Before Hall can successfully move to suppress evidence in a federal court, she must have a federal basis for doing so. The only federal justification in this case is that § 2517 forbids disclosure of wiretap information to state officers unless use of such information would be "appropriate to the proper performance of [their—i. e., the state officers'] official duties." This, Hall argues, incorporates the state law. Her point, however, rests on a challenge based upon Title III, and thus she must meet the standing requirements of that title. Section 2518(10)(a), *supra,* requires that she be "aggrieved" when she moved to suppress "evidence derived" from the contents of an intercepted communication. Use of the evidence against her does not make her an "aggrieved" person. She must have been a victim of the interception. *Jones v. United States, supra.* She was not.

For the reasons stated, I concur in the judgment of affirmance.

BROWNING, Circuit Judge, concurs in the foregoing opinion.

KOELSCH, Circuit Judge (dissenting), with whom ELY and HUFSTEDLER, Circuit Judges, join:

I am obliged to dissent.

The majority misapprehends and oversimplifies appellant's argument. Accordingly, it endorses a novel variation on the sort of illegal trade-off repudiated by the Supreme Court in *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960),[1] while simultaneously submerging the "imperative of judicial integrity" keynoted in that decision, *id.* at 222–223, 80 S.Ct. 1437. More fundamentally, it unduly warps established legal principles, enabling it to ride roughshod over both state and federal law.

The material facts are these: Federal narcotics agents disclosed drug-related information obtained by means of a duly authorized federal wiretap to their California State counterparts and indicated to the latter the source of that information. The

---

1. In *Elkins,* of course, the Supreme Court held inadmissible in a federal prosecution evidence obtained by state officers in a search which would have violated the fourth amendment, had it been conducted by federal officers—even though federal officers did not participate in that search. Without now considering whether the conduct of the state officers in the instant case may encompass a fourth amendment violation, I deem this court's ratification of the officers' violation of the rules of conduct established for them by the state which employs them no less a compromise of the integrity of the federal courts, particularly where, as here, the federal statute governing the admissibility of evidence so gathered contemplates deference to state-imposed rules of conduct with respect to such officers.

state agents would have been exceeding the permissible limits of their authority and in violation of both state and federal law if they themselves had conducted the wiretap;[2] but they nevertheless acted upon the information and not only set up surveillance on one Cooper, who the federal agents had stated might be in possession of narcotics, but also stopped the automobile in which he and Hall were travelling and seized from Hall's purse a paper bag containing heroin. However, because the seizure was in violation of Cal.Penal Code § 631 and the heroin would have been inadmissible in a state prosecution, *see People v. Jones,* 30 Cal.App.3d 852, 106 Cal.Rptr. 749 (1973), *appeal dismissed for want of a substantial federal question,* 414 U.S. 804, 94 S.Ct. 163, 38 L.Ed.2d 40 (1973),[3] they turned it over to the federal agents who ultimately used it to obtain Hall's indictment and conviction on a federal misdemeanor charge.[4]

Focusing on the specific provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, which govern the admissibility of wiretap-derived evidence in federal courts, it should be noted that 18 U.S.C. § 2515 prohibits the admission in evidence of matter derived from a wire interception "if the disclosure of that information would be in

violation of [Title III]." In addition, 18 U.S.C. § 2517(3), Title III's sole affirmative authorization of the disclosure in a court proceeding of information derived from a wire interception, provides:

"(3) Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof."

Hence, in order for wiretap-derived evidence to be admissible under Title III, the "authorized disclosure" requirement of § 2515 must be satisfied, as must the two conditions imposed by § 2517(3): (1) the interception must have been conducted "in accordance with the provisions of [Title III]," and, beyond that, (2) the person testifying must have "received [the information] . . . by . . . means authorized by [Title III]."

It follows that 18 U.S.C. §§ 2517(1) and (2), the provisions of Title III which govern the receipt, disclosure, and use of wiretap-derived information by law enforcement of-

---

**2.** *See* 18 U.S.C. § 2516(2); Cal.Penal Code § 631; and *People v. Jones,* 30 Cal.App.3d 852, 854, 106 Cal.Rptr. 749 (1973), *appeal dismissed for want of a substantial federal question,* 414 U.S. 804, 94 S.Ct. 163, 38 L.Ed.2d 40 (1973).

**3.** That the state officers used the wiretap information in seizing the heroin (and that the heroin was evidence derived from the interception) is implicit in the government's concession that the heroin would not be admissible in a state court proceeding under *Jones, supra.* If the heroin were gathered by means sufficiently attenuated from the illegal use of the interception to be distinguishable, it would not be "obtained in violation of this section" within the meaning of § 631(c) and the *Jones* rule would be inapplicable. The lack of attenuation is similarly implicit in the government's argument that the federal statute pertaining to the admissibility of evidence *derived from* a federally authorized wiretap is applicable to the heroin. Understandably, the government does not raise the inconsistent contention that the chain of use of

the wiretap evidence was broken, *i. e.,* that the officers came by the heroin "by means sufficiently distinguishable to be purged of the primary taint" of their initial illegal use of the wiretap information. *See Wong Sun v. United States,* 371 U.S. 471, 487–488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

**4.** To conclude that Hall is without standing to raise her argument is to misapprehend that argument. Having been charged with possession of the heroin at the time it was seized from her own purse, Hall clearly had standing to move to suppress it. *See Brown v. United States,* 411 U.S. 223, 227, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Jones v. United States,* 362 U.S. 257, 263, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Further, she is entitled to argue on that motion to suppress that the state officers' use of the wiretap information—a use unlawful under both state and federal law and clearly directed at Hall—renders the heroin seized from her purse *inadmissible in federal court.*

ficers, are dispositive here. Those provisions are as follows:

"(1) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communications, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

"(2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties."

Under these provisions, a state officer[5] may receive and use wiretap information only to the extent such receipt and use is appropriate to the proper performance of his official duties. Because the scope of a state officer's official duties is defined by state, not federal, law, Title III incorporates a state's rules on the use of wiretap information by its own officers. Thus, the California officers' use of the wiretap information—a use rendered inappropriate to the proper performance of their official duties by § 631—makes the questioned evidence inadmissible under Title III, and the heroin should therefore have been suppressed.

The plain language of the provisions supports the conclusion that Congress intended to prohibit officers using wiretap-derived evidence from violating the rules of conduct established by the sovereignty which employs them; it does not speak of a uniform federal standard of conduct but rather concerns itself with the "official duties" of the specific officer—state or federal—making or receiving the disclosure or using its contents. Had Congress intended by Title III to obliterate the more restrictive rules of conduct which some states impose on their own law enforcement officers, or to "conscript" state officers into a federal agency in which they are authorized to violate state privacy laws with impunity, it certainly could have said so more clearly. I will not infer such intent without a clearer expression by Congress.

The legislative history of the provisions similarly supports my conclusion. True, the Senate Committee in its report declared generally that § 2517(1) "envisions close Federal, State, and local cooperation" and "[t]he utilization of an information-sharing system within the law-enforcement community circumscribed by suitable safeguards for privacy. . . ." 1968 U.S. Code Cong. & Admin. News, p. 2188. But it was careful to note its awareness that the term "any investigative or law-enforcement officer" as employed in the statute includes state officers and to expressly qualify its observation with this concluding sentence: "Only disclosure that is appropriate to the proper performance of the official duties of the officers making and receiving the disclosure may be made." *Id.* Similarly, in discussing § 2517(2), the lawmakers reiterated the view that "[o]nly use that is appropriate to the proper performance of official duties may be made." *Id.*

The majority's analysis of Title III as "an applicable federal statute" is elusive, but it appears to hold, in general terms, that the federal statute conflicts with § 631 and hence, under the Supremacy Clause, preempts the latter section to the extent of the conflict.[6] However, I discern no conflict

---

**5.** The term "investigative or law enforcement officer" includes "any officer . . . of a State . . . who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter . . . ." 18 U.S.C. § 2510(7).

**6.** The term "pre-emption" is often employed with reference to congressional intent to super-

sede and preclude state regulation on a given subject by "occupying the field" and hence divesting the state of its power to regulate, *see, e. g., Merrill Lynch, Pierce, Fenner & Smith v. Ware,* 414 U.S. 117, 137–140, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973); *New York Dept. of Social Services v. Dublino,* 413 U.S. 405, 412–423, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); *Florida Avocado Growers v. Paul,* 373 U.S. 132, 146–152,

between the two statutes nor any congressional intent that Title III pre-empt the more restrictive provisions of parallel state laws, particularly where such laws seek to limit the conduct of officers employed by the state. To the contrary, I suggest that Congress sought to incorporate into Title III state-imposed limitations on the conduct of state officers, thus rendering the state officers' violation of § 631 here a violation of Title III as well.[7] To conclude otherwise, as the majority seems to do, is to find in Title III a congressional intent to encourage state officers to break faith with the state and its citizens and violate clearly expressed state policy. Congress did indeed contemplate "close cooperation" between federal officers and the officers of states welcoming such cooperation, *see, e. g., United States v. Manfredi,* 488 F.2d 588, 601 (2d Cir.1973); *United States v. Forlano,* 358 F.Supp. 56, 59 (S.D.N.Y.1973), but it did not intend to "conscript" into federal employ the officers of unwilling states such as California.

The majority's discussion of the supposed conflict would be better focused if it gave explicit attention to whether the use prohibition of § 631 contravenes the objectives underlying Title III, for it is only if the state law "stands as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress" that it must fall under the Supremacy Clause. *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941) (footnote omitted). I submit that the state statute provides no such impediment.

To the contrary, the stated general purposes of the two enactments support the view that they are wholly consistent. As the Senate Report on Title III clearly indicates, the federal statutory scheme

"has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." 1968 U.S. Code Cong. & Admin. News, p. 2153.

Though the stated need for uniform standards might ordinarily evince an intent to occupy the field, the legislative history of the federal scheme is replete with references to numerous areas in the field of electronic surveillance in which state laws may be controlling, thereby causing the California Supreme Court to conclude in *People v. Conklin,* 12 Cal.3d 259, 114 Cal. Rptr. 241, 522 P.2d 1049 (1974), *appeal dismissed for want of a substantial federal question,* 419 U.S. 1064, 95 S.Ct. 652, 42 L.Ed.2d 661 (1974), that the stated need for uniform standards was merely an expres-

---

83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), but that question is not raised by the majority. The constitutional source of the federal power to regulate in the field of communications is the commerce clause, *see Benanti v. United States,* 355 U.S. 96, 104, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957), while the state's power to so regulate is the police power, one of those "reserved to the States respectively, or to the people" under the tenth amendment. It has been authoritatively determined that Title III preempts the state's power to regulate electronic surveillance only to the extent that the questioned state regulations are more permissive than federal requirements, not to the extent state requirements are more restrictive. *People v. Conklin,* 12 Cal.3d 259, 114 Cal.Rptr. 241, 522 P.2d 1049 (1974), *appeal dismissed for want of a substantial federal question,* 419 U.S. 1064, 95 S.Ct. 652, 42 L.Ed.2d 661 (1974). The United States Supreme Court's dismissal of the appeal in *Conklin* ratifies on the merits the California Supreme Court's conclusion that Congress did not intend to occupy the entire field of electronic

surveillance to the exclusion of state regulation. *See Hicks v. Miranda,* 422 U.S. 332, 344–345, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), and cases cited in text following note 12. Instead, the pre-emption issue raised by the majority is the narrower question whether the use prohibition of § 631(a) must fall under the Supremacy Clause because, and to the extent that, it irreconcilably conflicts with the provisions of Title III. *See Dublino, supra,* 413 U.S. at 422–423, 423 n.29, 93 S.Ct. 2507; *Goldstein v. California,* 412 U.S. 546, 560–571, 93 S.Ct. 2303, 37 L.Ed.2d 163, (1973); *Perez v. Campbell,* 402 U.S. 637, 644–656, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); *Benanti, supra,* 355 U.S. at 103–106, 78 S.Ct. 155.

7. My view of Title III would be just as responsive if the majority were to couch its analysis not in terms of "pre-emption" but if it were instead to rest on the position that questions of admissibility of evidence under Title III are to be resolved without reference to state law.

sion of intent to ensure nationwide compliance with the decisions in *Berger v. New York,* 388 U.S. 41, 47–49, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). It is implicit in the Senate Report that Title III was enacted as a response to *Berger* and *Katz, see* 1968 U.S.Code Cong. & Admin.News, pp. 2153–2156, and the desired compliance with those decisions is presumably achieved where a state statute meets the minimum standards of the federal enactment. On the other hand, the more restrictive requirements of state laws such as § 631 serve to satisfy the remaining objective of Title III, protection of the right of privacy. Notably, that latter objective is the primary purpose of the California Invasion of Privacy Act—of which Cal.Penal Code § 631 is a part.

Other provisions of Title III substantiate the view that Congress envisioned parallel state laws co-existing with Title III and, in some cases, being incorporated into the federal statute. For example, 18 U.S.C. § 2511, which makes criminal the interception, disclosure, and use of wire or oral communications except as specifically authorized by Title III, is clearly not intended to pre-empt parallel state criminal laws such as § 631.[8] The same is true of 18 U.S.C. § 2512.[9] Similarly, 18 U.S.C. § 2517(4) incorporates into Title III the relevant state law of privileged communications.[10]

Perhaps even more significantly, 18 U.S.C. § 2516(2)—the section dealing with the authorization of state interception warrants for the investigation by state officers of certain state crimes—permits an appropriate state law enforcement officer to apply for a state warrant only where specifically authorized not only by Title III but by a state statute as well. If Congress did not intend that state interception warrants issue or that state investigations employ electronic surveillance techniques without affirmative legislative ratification of such procedures by the state, it is no great leap to conclude that Congress intended to defer to more restrictive state policies governing the conduct of state officers.[11]

---

8. The legislative history of § 2511 provides in part as follows:

"Subparagraphs (c) and (d) prohibit, in turn, the disclosure or the use of the contents of any intercepted communication by any person knowing or having reason to know the information was obtained through an interception in violation of this subsection. The disclosure of the contents of an intercepted communication that had already become 'public information' or 'common knowledge' would not be prohibited. The scope of this knowledge required to violate either subparagraph *reflects existing law* . . .. A violation of each must be willful to be criminal . . .. Each prohibition strikes not only at the prohibited action but also at endeavors . . . and procurements . . . . *There is no intent to pre-empt State law.*" 1968 U.S. Code. Cong. & Admin. News p. 2181 (citations omitted; emphasis supplied).

9. The legislative history of § 2512 provides:

"The provisions of section 2512 banning the manufacture, distribution, sale, possession, and advertising of wiretapping and eavesdropping devices will significantly curtail the supply of a variety of devices. *There is no intent to preempt State law.*" 1968 U.S. Code Cong. & Admin. News, p. 2183 (emphasis supplied).

10. The Senate Report states the following with respect to § 2517(4):

"Paragraph (4) provides that no otherwise privileged wire or oral communication intercepted in accordance with or in violation of the new chapter shall lose its privileged character. Traditionally, the interest of truth in the administration of justice has been subordinated in the law to the interest of preserving privileged communications where four relationships have been involved: physician-patient, lawyer-client, clergyman-confidant, and husband-wife. *The scope and existence of these privileges varies from jurisdiction to jurisdiction.* The proposed provision is intended to vary the existing law only to the extent it provides that an otherwise privileged communication does not lose its privileged character because it is intercepted by a stranger. . . . *Otherwise, it is intended to reflect existing law.* . . ." 1968 U.S. Code Cong. & Admin. News, p. 2189 (citations omitted; emphasis supplied).

11. The legislative history of § 2516(2) provides in relevant part as follows:

"Paragraph (2) provides that the principal prosecuting attorney of any State or the principal prosecuting attorney of any political subdivision of a State may authorize an application to a State judge of competent jurisdiction, as defined in section 2510(9), for an

The majority deems 18 U.S.C. § 2520 supportive of its position, but I find the argument raised of little substance. The statutory language relied on, with italics supplied by the majority, is as follows:

"A good faith reliance on a court order or legislative authorization shall constitute a complete defense to any civil or criminal action brought under this chapter *or under any other law*."

It should be noted that the portion of § 2520 omitted from the quotation authorizes the recovery of civil damages from any person intercepting a wire or oral communication, or disclosing or using it, in violation of Title III. The legislative history of that civil damages provision states:

"The scope of the remedy is intended to be both comprehensive and exclusive, but there is no intent to preempt parallel State law." 1968 U.S. Code Cong. & Admin. News, p. 2196.

Hence § 2520, contrary to the majority's position, provides strong support for the view that Congress regarded state and federal law as both compatible and coexistent when it enacted Title III. Moreover, since the civil remedy created by § 2520 is intended to be the "exclusive" civil remedy for interceptions, disclosures, and uses which violative Title III, the congressional intent should be plain that existing "parallel state law" continues, after the enactment of Title

III, to provide a civil remedy for the violation of state laws such as § 631.

In addition, the very words of § 2520 which the majority has italicized and on which it most heavily relies were not contained in the section as originally enacted. Those words were added by amendment of July 29, 1970, P.L. 91–358, Title II, § 211(c), 84 Stat. 654, and hence at most manifest congressional intent at the later date, not at the time of the enactment of Title III. The legislative history of the amendment is sparse, but it shows that the amendment originated in the Senate version of the district of Columbia Court Reform and Criminal Procedure Act of 1970 and sought to cause § 2520 to "conform" to the wiretap civil damages provision for the District of Columbia also contained in that Act. *See* H.R. 91–1303, 91st Cong., 2d Sess., at 203–204, 238 (1970). The reason why it was desirable for a statute of national application expressly to adopt the language of the District of Columbia statute is unclear. However, since it should be apparent that the local statute has no pre-emptive effect on the California law, I think it only reasonable that the conforming amendment to § 2520, enacted as an apparent legislative afterthought, should not be read to support pre-emption of California law by other sections of Title III, particularly when pre-emption of state law is directly disclaimed by the legislative history of § 2520 at the

order authorizing the interception of wire or oral communications. *The issue of delegation by that officer would be a question of State law.* In most States, the principal prosecuting attorney of the State would be the attorney general. The important question, however, is not name but function. *The intent of the proposed provision is to provide for the centralization of policy relating to statewide law enforcement in the area of the use of electronic surveillance in the chief prosecuting officer of the State. Who that officer would be would be a question of State law.* Where no such office exists, policymaking would not be possible on a statewide basis; it would have to move down to the next level of government. In most States, the principal prosecuting attorney at the next political level of a State, usually the county, would be the district attorney, State's attorney, or county solicitor. *The intent of the proposed provision is to centralize areawide*

*law enforcement policy in him. Who he is would also be a question of State law.* Where there are both an attorney general and a district attorney, either could authorize applications, the attorney general anywhere in the State and the district attorney anywhere in his county. The proposed provision does not envision a further breakdown. Although city attorneys may have in some places limited criminal prosecuting jurisdiction, the proposed provision is not intended to include them.

"*No applications may be authorized unless a specific State statute permits it. The State statute must meet the minimum standards reflected as a whole in the proposed chapter. The proposed provision envisions that States would be free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation.*" 1968 U.S. Code Cong. & Admin. News, p. 2187 (emphasis supplied).

time Title III was enacted. And even assuming Congress may have sought to erect a defense to prosecutions under criminal statutes such as § 631 for officers relying in good faith on a federal warrant, this in no way erases the expression of policy contained in the state statute.[12]

In sum, a review of the general purposes and specific provisions of Title III indicates that whether the conduct of state officers is "appropriate to the proper performance of [their] official duties" within the meaning of §§ 2517(1) and (2) is properly a question of state law.

Were the majority correct in its conclusion that the circumstances of this case raise an irreconcilable conflict between the use prohibition of § 631 and the provisions of Title III simply because the interception conducted here was accomplished in conformity with the federal statute, it would necessarily follow that *People v. Jones,* 30 Cal.App.3d 852, 106 Cal.Rptr. 749 (1973), *appeal dismissed for want of a substantial federal question,* 414 U.S. 804, 94 S.Ct. 163, 38 L.Ed.2d 40 (1973), is erroneous. To the contrary, *Jones* is indisputably correct.

In *Jones,* the California Court of Appeal held that Cal.Penal Code § 631(c), which renders evidence obtained in violation of § 631(a) inadmissible in a state court proceeding, precludes the admission of such evidence even where obtained in conformity with a duly authorized federal warrant. I perceive no basis for distinguishing between

the exclusionary rule of § 631(c) and the use prohibition of § 631(a); each of those provisions is a device for eliminating a separate but derivative invasion of privacy which may follow an unauthorized interception in violation of the wiretapping prohibition of § 631(a).[13] If evidence obtained in conformity with federal standards but in violation of § 631(a) can be excluded in state court proceedings under § 631(c), its use by state officers continues to be precluded by § 631(a) itself.

Moreover, the *Jones* court ruled that § 631(c) presented no conflict with Title III and was not pre-empted by the federal statute. It did so in the face of 18 U.S.C. § 2517(3), *supra* text p. 1238, which authorizes the disclosure of wiretap-derived evidence "in any proceeding held under the authority . . . of any State or political subdivision thereof." I submit that the only way to reconcile § 2517(3) with § 631(c), in view of *Jones* is to conclude that a violation of the state statute gives rise to a violation of Title III as well. It follows that §§ 2517(1) and (2) should be read to incorporate the use prohibition of § 631(a).

Significantly, the United States Supreme Court dismissed an appeal of *Jones* for want of a substantial federal question, thereby confirming the merits of the *Jones* view that § 631(c) is not pre-empted by Title III. It is beyond dispute that the Supreme Court's dismissal of an appeal "for want of a substantial federal question" is a

---

12. As no state prosecution is involved here, it is not before us whether a state officer who *knowingly* violates § 631 can be said to be acting in good faith, but at least one court has expressed some doubt on the subject. In its unanimous decision in *People v. Conklin, supra* note 5, 12 Cal.3d at 273 n.13, 114 Cal.Rptr. 241, 522 P.2d 1049, the Supreme Court of California reserved the question whether a state may criminally prosecute a federal agent for knowingly violating state law when he has obtained and executed a warrant in compliance with Title III. *See also* Comment, *Electronic Surveillance in California: A Study in State Legislative Control,* 57 Calif.L.Rev. 1182, 1210 (1969).

13. Were it not for the provision of § 631(a) which prohibits *the use in any manner* of information derived from an unauthorized wiretap,

a person (including a state law enforcement officer) obtaining such information secondhand could disseminate and otherwise use it with impunity so long as the use itself was not otherwise illegal. *See* Comment, *supra* note 11, 57 Calif.L.Rev. at 1208–1209. The use prohibition is designed to halt the dissemination of such information for any purpose, legal or illegal, because such action by a secondhand recipient violates the protected zone of privacy just as effectively as the initial wiretap. It should be noted that here the taint which attaches to the heroin derives not from the federal officers' conducting the wiretap but from the state officers' prohibited use of its contents—itself a direct violation of the state statute; the heroin is fruit of the "poisonous tree" of the use, not the wiretap.

decision on the merits of all issues raised by that appeal. *Hicks v. Miranda,* 422 U.S. 332, 344–345, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975); *Ohio ex rel. Eaton v. Price,* 360 U.S. 246, 247, 79 S.Ct. 978, 3 L.Ed.2d 1200 (1959); *Wardwell v. Board of Education of City of Cincinnati,* 529 F.2d 625, 627–628 (6th Cir. 1976); *Hogge v. Johnson,* 526 F.2d 833, 835 (4th Cir. 1975); *Wernick v. Matthews,* 524 F.2d 543, 547 (5th Cir. 1975); *Gault v. Garrison,* 523 F.2d 205, 206–207 (7th Cir. 1975); *Connor v. Hutto,* 516 F.2d 853, 854 (8th Cir. 1975); *Wright v. City of Jackson,* 506 F.2d 900, 902–903 (5th Cir. 1975); *Ahern v. Murphy,* 457 F.2d 363, 364–365 (7th Cir. 1972); *United States ex rel. Epton v. Nenna,* 446 F.2d 363, 366 (2d Cir. 1971); *Heaney v. Allen,* 425 F.2d 869, 871 (2d Cir. 1970). In so dismissing *Jones,* the Court branded a Supremacy Clause challenge to § 631—a challenge which the state court had rejected—constitutionally insubstantial, and its conclusion should be deemed controlling here.

With reference to the continuing vitality of *Jones,* I note that at least four subsequent California decisions have, without dissent, recognized it as the law of California. *See Conklin, supra,* 12 Cal.3d at 273 n.13, 114 Cal.Rptr. 241, 522 P.2d 1049; *People v. Howard,* 55 Cal.App.3d 373, 378–379, 127 Cal.Rptr. 557 (1976); *People v. Carbonie,* 48 Cal.App.3d 679, 685, 121 Cal.Rptr. 831 (1975); *People v. Carrington,* 40 Cal. App.3d 647, 649, 115 Cal.Rptr. 294 (1974).[14]

Beyond these considerations, principles of comity dictate the construction of Title III advanced here. Assuming it has the power to do so, the federal government is not in the habit of affirmatively requiring state police officers to undertake duties which the state has not authorized, let alone explicitly prohibited. Absent the clearest of statutory mandates, we should not infer congressional intent to require, or otherwise authorize, that state officers "cooperate" with federal officers by conducting a use of wiretap-derived information specifically proscribed by the state.

In this connection, our recent decision in *Brown v. Environmental Protection Agency,* 521 F.2d 827 (9th Cir. 1975)—in which we adopted "an interpretation [of a federal statute] which [made] it unnecessary for us to face the issue of whether Congress can prevent a state's withdrawal from the field," *see* 521 F.2d at 840—bears unquestionable significance here. *See generally* 521 F.2d at 837–842. A portion of the *Brown* panel's quotation from the late Professor Henry M. Hart, Jr., seems particularly apt:

> " 'Federal law often says to the states, "Don't do any of these things," leaving outside the scope of its prohibition a wide range of alternative courses of action. But it is illuminating to observe how rarely it says, "Do *this* thing," leaving no choice but to go ahead and do it. The *Federalist* papers bear ample witness to the Framers [*sic*] awareness of the delicacy, and the difficulties of enforcement, of affirmative mandates from a federal government to the governments of the member states.

> \*　　\*　　\*　　\*　　\*　　\*

> " 'Judicial mandates to non-judicial state officers to enforce either primary or remedial duties requiring the performance of affirmative acts are relatively infrequent. Lower federal courts may *prohibit* state officers, in their individual capacity, from taking action under color of office in violation of law. But an action to compel the performance of an affirmative act would encounter, ordinarily, the bar of the Eleventh Amendment. Whether a writ of mandamus to compel performance of a ministerial duty would be regarded as an action against the state is not altogether clear. But it is significant that a practice of issuing such writs to state officers has never become established.' " *Brown, supra,* 521 F.2d at 841–842 [*quoting* Hart, *The Relations Between State and Federal Laws,* 54 Colum. L.Rev. at 515–516 (1954)] (emphasis in original).

14. *See also United States v. Manfredi,* 488 F.2d 588, 598 n.7 (2d Cir. 1973).

Of course it may be argued that the mere admission of evidence in federal court is not the sort of federal action "that impairs the States' integrity or their ability to function effectively in a federal system," see *Fry v. United States*, 421 U.S. 542 n.7, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975) *Brown, supra*, 521 F.2d at 842. However, I submit that the construction of Title III by which the majority attains the admission of such evidence—a construction which labels a direct violation of the state's criminal invasion-of-privacy law "appropriate to the proper performance of [the] official duties" of state officers—is no inconsequential intrusion on the state's realm. Hence I consider that construction—reading into Title III the congressional intent to deputize state officers into illicit investigative "cooperation" decried by the state—not only an undeserved blight on Congress but a compromise of the integrity of the federal courts as well. In my view, due respect for our constitutional system forbids our ignoring, if not rewarding, a state officer's violation of the commands of the sovereignty which employs him.

The majority's hypothetical discussion of *United States v. Di Re*, 332 U.S. 581, 589–590, 68 S.Ct. 222, 92 L.Ed. 210 (1948), is similarly misguided. In this circuit, *Di Re* has long stood for the proposition that, absent an applicable federal statute, the law of the state where an arrest without a warrant by state officers takes place establishes its validity, subject to the subsequent application of federal constitutional standards,[15] and the Supreme Court has consistently reaffirmed the vitality of the *Di Re* rule.[16]

---

**15.** *See, e. g., United States v. Pricepaul,* 540 F.2d 417, 424 n.4 (9th Cir. 1976); *United States v. Solomon,* 528 F.2d 88, 90 (9th Cir. 1975); *United States v. Scott,* 520 F.2d 697, 700 (9th Cir. 1975); *United States v. Lovenguth,* 514 F.2d 96, 98 (9th Cir. 1975); *Bergstralh v. Lowe,* 504 F.2d 1276, 1277 (9th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1131, 43 L.Ed.2d 402 (1975); *United States v. Walling,* 486 F.2d 229, 235 (9th Cir. 1973), *cert. denied,* 415 U.S. 923, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1974); *United States v. Fisch,* 474 F.2d 1071, 1075 (9th Cir. 1973), *cert. denied,* 412 U.S. 921, 93 S.Ct. 2742, 37 L.Ed.2d 148 (1973); *United States v. Blum,* 432 F.2d 250, 252 (9th Cir. 1970); *Call v. United States,* 417 F.2d 462, 464 (9th Cir. 1969); *Duran v. United States,* 413 F.2d 596, 606 (9th Cir. 1969); *Wartson v. United States,* 400 F.2d 25, 27 (9th Cir. 1968), *cert. denied,* 396 U.S. 892, 90 S.Ct. 184, 24 L.Ed.2d 166 (1969); *Sabbath v. United States,* 380 F.2d 108, 110–111 (9th Cir. 1967); *Dagampat v. United States,* 352 F.2d 245, 247 (9th Cir. 1965), *cert. denied,* 383 U.S. 950, 86 S.Ct. 1209, 16 L.Ed.2d 212 (1966).

A few other circuits appear to have adopted a contrary rule based on the oft-quoted dictum of *Elkins v. United States,* 364 U.S. 206, 223–224, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960), as follows:

"In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed."

*See United States v. Alberty,* 448 F.2d 706, 708 (10th Cir. 1971); *United States v. Sims,* 450 F.2d 261, 262–263 (4th Cir. 1971); *United States v. Melancon,* 462 F.2d 82, 91–92 (5th Cir. 1972).

However, I see no inconsistency between *Di Re, supra,* as followed in this circuit, and *Elkins,* which held "that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial." 364 U.S. at 223, 80 S.Ct. at 1447. It would appear that the *Elkins* dictum concerns the second prong of the *Di Re* test, *i. e.,* whether federal constitutional standards were violated by the state officers. Notably, the circuits which depart from this court's interpretation of *Di Re* seem to reason that *Elkins* somehow "vitiated" the holding of *Di Re.* See *Alberty, supra,* 448 F.2d at 708. However, *United States v. Watson,* 423 U.S. 411, 420 n.8, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), and *Ker v. California,* 374 U.S. 23, 37–41 (opinion of Clark, J.), 62, 83 S.Ct. 1623, 10 L.Ed.2d 726 (opinion of Brennan, J.) (1963), strongly suggest otherwise.

**16.** *See United States v. Watson,* 423 U.S. 411, 420 n.8, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Ker v. California,* 374 U.S. 23, 37–41 (opinion of Clark, J.), 62, 83 S.Ct. 1623, 10 L.Ed.2d 726 (opinion of Brennan, J.) (1963); *Miller v. United States,* 357 U.S. 301, 305–306, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); *Johnson v. United States,* 333 U.S. 10, 15 n.5 (1948); *John Bad Elk v. United States,* 177 U.S. 529, 535, 20 S.Ct. 729, 44 L.Ed. 874 (1900).

The majority purports to distinguish the case before us from *Di Re* based on its assertion that here, unlike *Di Re*, no question of the quantum of probable cause for the search and arrest is presented. This mischaracterization is supplied by the government's brief, which wrongly casts probable cause as conceded by Hall.

I find myself unable to accept the conclusion that no question of probable cause exists. Where a state chooses to prohibit certain conduct by its law enforcement officers (e. g., the use of information obtained by prohibited means), that prohibition stands as a limitation on the state officer's power to arrest just as effectively as other statutory limitations on the arrest power.[17] Indeed, the California courts have indicated that a finding of probable cause to search, seize, or arrest may not be predicated on illegally obtained evidence, see, e. g., *People v. Shipstead*, 19 Cal.App.3d 58, 73–74, 75–76, 96 Cal.Rptr. 513 (1971); and I venture that those courts would declare the instant arrest unlawful because no probable cause existed. In cases in which evidence obtained in violation of Cal.Penal Code § 631 has been offered as a basis for probable cause, California courts have not permitted its use for that purpose; those courts will only consider information obtained by wholly independent means. *See People v. Howard*,

55 Cal.App.3d 373, 378–379, 127 Cal.Rptr. 557 (1976); *People v. Buchanan*, 26 Cal. App.3d 274, 289–290, 103 Cal.Rptr. 66 (1972). And here, of course, no independently derived evidence sufficient to sustain a finding of probable cause exists. This, I submit, is the very reason why the heroin found its way into the hands of federal prosecutors.

Despite the majority's purported distinction of *Di Re*, the use prohibition of § 631 has a direct bearing on the calculus of probable cause for arrest under the circumstances of this case; without the prohibited use, there is no probable cause. This is what *Di Re* is about, and when, under *Di Re*, Hall's detention, search, and arrest are measured by California standards, they are clearly unlawful. If Title III were not controlling as "an applicable federal statute," the challenged evidence would be subject to suppression under the federal common law rule of *Di Re*.[18]

I would reverse.

CHAMBERS, Circuit Judge (concurring):

While I believe Judge Duniway's views on "no standing" are correct, a majority has apparently rejected his contentions. Since we have reached this point, I now concur in Judge Choy's opinion.

17. For example, I find little difference between the use prohibition involved here and the New York statutory rule, noted by the majority, that a police officer may not arrest a person without a warrant for a misdemeanor unless the offense is committed in the arresting officer's presence. I have no doubt that the two state rules were enacted to effectuate different policies, but each renders a certain type of evidence (in the one case, wiretap evidence; in the other, secondhand evidence of a misdemeanor) an impermissible basis for a warrantless arrest. The Supreme Court has long recognized that state-enacted strictures on arrests, searches, and seizures by state officers may be more rigorous than federal constitutional requirements, see, e. g., *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), and it is this very principle which underlies the two-pronged *Di Re* test for the validity of arrests by state officers.

18. The majority's discussion of "state law and federal admissibility" also misses the mark. It should first be noted that that discussion, like the majority's discussion of *Di Re*, is dictum, the majority having held that the admissibility of the questioned evidence is governed by Title III, the "applicable federal statute." Hence the majority's use of the phrase "we hold" is misleading. More significantly, however, the purported application of *United States v. Keen*, 508 F.2d 986 (9th Cir. 1974), *cert. denied*, 421 U.S. 929, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975), to the facts of the case before us is wholly inappropriate. Unlike the instant case, *Keen* did not encompass the involvement of state officers; by purporting to extend *Keen* to cases in which state officers played a significant role, the majority attempts *sub silentio* to overrule the *Di Re* principle as consistently applied in this circuit.