**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Aurelio AVILA–MACIAS and Ernesto
Laranaga, Defendants-Appellants.**

**Nos. 77–3807, 77–3184.**

United States Court of Appeals,
Ninth Circuit.

July 13, 1978.

---

R. Richard Fusilier, Hollywood, Cal., Howard W. Gillingham, Los Angeles, Cal., for defendants-appellants.

No appearance for plaintiff-appellee.

Before ELY and GOODWIN, Circuit Judges, and PALMIERI *, District Judge.

PALMIERI, District Judge:

This is an appeal by two of four defendants convicted of violations of the federal narcotics laws. Appellant Aurelio Avila-Macias (Avila) was sentenced to four concurrent jail terms of 10 years each, to be followed by a special parole term of 3 years. Appellant Ernesto Laranaga (Laranaga)

* Hon. Edmund L. Palmieri, Senior U.S. District Judge for the Southern District of New York, sitting by designation.

was sentenced to two concurrent jail terms of 5 years each, also with a special parole term of 3 years to follow.

Avila was charged in Counts 1 and 2 of the indictment with possession with intent to distribute and distribution of 24.5 grams of heroin on June 7, 1977 and in Counts 3 and 4 with aiding and abetting Jesus Felix-Corona (Corona) (a co-defendant who was indicted and convicted on all four counts but has not appealed) in the possession with intent to distribute and distribution of 1,761.5 grams of heroin. Laranaga was charged only in Counts 3 and 4 with aiding and abetting Corona in the offenses just stated. The violations of law charged in the indictments were based upon 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. A fourth defendant, Eduardo Perez (Perez), successfully moved for a severance and a mistrial during the course of the trial upon an express waiver of any claim of double jeopardy.

Construing the evidence and all reasonable inferences therefrom in the light most favorable to the Government, *Glasser v. U. S.*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Hermosillo-Nanez*, 545 F.2d 1230, 1232 (9th Cir.), *cert. denied*, 429 U.S. 1050, 97 S.Ct. 763, 50 L.Ed.2d 767 (1977), the following facts appear.

A Government informant, Jose Rivera, had several meetings and conversations with Corona concerning the prospective sale and purchase of cocaine and heroin in the early part of June 1977. As a result, on June 7, 1977 Rivera and an undercover agent of the Drug Enforcement Administration (DEA), John Granados, met Corona at the El Patio Bar in Los Angeles for the express purpose of obtaining a sample of the drugs. Rivera had been previously advised by Corona by telephone that the sample was available and their meeting at the El Patio Bar had been agreed upon for that evening. When Rivera arrived Corona told him the sample was not there but that "they are going to bring it right away". Shortly thereafter, Avila arrived at the bar and had a conversation with Corona. Both left the bar for a moment. Avila returned, answered a phone call, and again left. Corona assured Rivera in the meantime that the sample was on its way. Shortly thereafter, Avila returned to the bar. Avila and Corona went outside near the doorway of the bar, and as Rivera watched from inside the bar, Avila gave something to Corona which he placed in his shirt pocket. Corona then stepped back inside the bar and Rivera followed him into the men's bathroom. After a conversation between them regarding a safer place to deliver the sample, they walked to another bar nearby where Corona took the sample, consisting of one ounce of heroin, out of his shirt pocket and gave it to Rivera. Rivera expressed his dissatisfaction with the quality of the sample. Corona replied that a better sample would be available shortly, and about half an hour later, at the El Patio Bar, Corona gave Rivera another one-ounce sample of heroin.

On June 8, 1977 Rivera and Corona discussed arrangements for a large purchase of heroin to take place the following day, June 9, 1977. That day, at about 9:00 a. m., Rivera telephoned Corona and discussed arrangements to buy 48 ounces of heroin from him. The transfer of heroin was to take place two hours later at a location to be chosen by Rivera and Granados. The location chosen by them was a parking lot in front of the Century Market, at the intersection of Century and Figueroa Boulevards. Rivera called Corona and told him where to meet them.

In addition to Rivera and Granados, several undercover DEA agents were at the Century Market area while another agent conducted surveillance in the area of the El Patio Bar. During the hour following his arrival at the Century Market parking lot, there were a number of telephone calls from Rivera to Corona, and promises by Corona that he would soon arrive. In reply to one of these calls, Corona said they had the merchandise and would soon be there. In the El Patio Bar area Corona was seen

meeting with Avila and at about 12:15 p. m. four men joined Avila and Corona outside the bar. One of them was the appellant Laranaga. One of them remained unidentified. The other two were Perez and one Reymundo Lopez. All six entered the bar and remained there for a brief period. The agents saw these men pat each others' waistbands and saw Lopez "relocate an object in his shirt"—an activity apparently intended to assure the proper concealment of loaded revolvers which were soon to be discovered by the DEA agents. Upon leaving the bar, Avila and Lopez boarded a white Chevrolet automobile while Corona, Laranaga, and Perez boarded a brown Oldsmobile which proceeded to a gasoline station near the corner of Century and Figueroa Boulevards, the white Chevrolet following. Laranaga left the Oldsmobile, went to a nearby telephone booth, and stood with his back to the telephone facing the Century Market. Perez drove the Oldsmobile to the parking lot of the Century Market. Avila and Lopez remained in the white Chevrolet parked across the street and appeared to be watching the market.

Rivera then joined Corona and Perez in the Oldsmobile, where Perez exhibited a package of heroin to Rivera, after removing it from under the front seat. Upon determining it was heroin Rivera left the car and advised Agent Granados, who gave an arrest signal. Laranaga was arrested in the phone booth and a loaded gun was removed from his belt. Perez was arrested in the Oldsmobile; a loaded weapon was retrieved from his waistband and the package of heroin from under the seat. Corona was also arrested in this car and relieved of a loaded weapon he had in his hand. Avila and Lopez were arrested in the Chevrolet, where a loaded gun was found on the floor between Avila's feet.

### The Juror's Passing by the El Patio Bar

■ Both appellants contend that prejudicial error was committed under the following circumstances. During the jury deliberations, the court received a note from the foreperson stating: "One of the jurors reports she went by the El Patio Bar on the way home yesterday. Does this affect her ability to serve?" The judge responded in the negative and called upon counsel to voice any objections. The attorneys concurred in the judge's statement that "going by, whether as a pedestrian or a rider, would not affect the ability [to serve]". Avila's attorney stated: "I would submit just riding by is perfectly all right"; and Laranaga's counsel stated his belief that it was a " 'no harm no foul' situation". After the jury returned its verdicts the court inquired of the foreperson whether the juror had gone inside the El Patio Bar and the answer was the juror had not. No further inquiry was conducted and we do not discern any reason why an evidentiary hearing was necessary. Despite the unanimity which prevailed in the trial court regarding the insignificance of the juror's passing by the bar premises,[1] both appellants now contend that the judge should have ascertained which juror made the unauthorized visit, the circumstances of the visit, and what information, if any, she gave to the other jurors. The trial judge acted within appropriate limits of his discretion in appraising the probability of prejudice and the nature of any initiative he felt impelled to take in the matter. *U. S. v. Love*, 535 F.2d 1152,

---

1. After the court's inquiry of the jury foreperson when the verdicts were received, the following colloquy took place:

> MR. FUSILIER: [Counsel for Avila] Your Honor, may we ask Mrs. Hobbs if she imparted any information to the Jury about her passing by?
> THE COURT: It's not Mrs. Hobbs, as I understand it. It's someone else. It isn't Mrs. Hobbs.
> FOREPERSON HOBBS: Someone else passed by.
> THE COURT: I think no further inquiry is needed. You can go home in a minute and go about your business and wait until you get another postcard.

We attach no significance to this colloquy as it appears to us that trial counsel simply abandoned any further interest in the matter.

1156–57 (9th Cir.), *cert. denied,* 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 119 (1976); *U. S. v. Hendrix,* 549 F.2d 1225, 1227–28 (9th Cir. 1977), *cert. denied,* 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1978). While Avila contested Rivera's testimony that, standing at a particular spot inside the bar, he was in a position to see Avila transfer a packet of heroin to Corona outside the open doorway of the bar, it is clear that the jury believed Rivera and rejected Avila's countervailing evidence. The evidence of the other events which took place outside or near the El Patio Bar could not have been affected by a passing by of the premises.

### Other Claims of Error

■ Rivera testified to statements made to him by Corona out of the presence of Avila. Counsel for Avila objected to this testimony on the ground that it was hearsay and the trial court overruled the objection subject to a motion to strike. This ruling was correct, as the statements are admissible under an established exception to the hearsay rule. Rule 801(d)(2)(E) of the Federal Rules of Evidence provides:

(d) A statement is not hearsay if—(2) . . . The statement is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Such out-of-court statements may be introduced against a defendant where independent evidence (proof *aliunde*) establishes the existence of a conspiracy and the defendant's knowledge of and participation in the conspiracy. *United States v. Testa,* 548 F.2d 847 (9th Cir. 1977). It is not necessary that a conspiracy have been charged. *United States v. Williams,* 435 F.2d 642, 645 (9th Cir.), *cert. denied,* 401 U.S. 995, 91 S.Ct. 1241, 28 L.Ed.2d 533 (1971). *See also* Judge Learned Hand's opinion in *United States v. Olweiss,* 138 F.2d 798 (2d Cir.), *cert. denied,* 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047 (1943). ["The notion that the competency of the declarations of a confederate is con-

fined to prosecutions for conspiracy has not the slightest basis; their admission does not depend upon the indictment, but is merely an incident of the general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal." 138 F.2d at 800.]

The quantum of proof of illicit association requisite to permitting the admission of a co-defendant's statement has been stated by this Court to be "substantial independent evidence of the conspiracy sufficient to sustain a finding (*i. e.,* to establish a *prima facie* case of the conspiracy and the defendant's knowledge of and participation in it)." *United States v. Testa, supra,* at 853. We are satisfied that that standard has been met here. Independent evidence was introduced at trial tending to show that Avila met with Corona several times on June 7 at the El Patio Bar; that he was seen handing an object to Corona just prior to Corona's delivery of a sample of heroin to informant Rivera; that he met with Corona at his (Avila's) residence on June 9 just shortly before the planned sale of a large quantity of heroin; that he was a passenger in the car which followed the Oldsmobile containing the heroin; that he was observed near the scene of the planned transfer, apparently watching; and that a loaded gun was found between his feet at the time of his arrest. This and other evidence would have amply justified a conclusion by the trial judge that Corona was the negotiator and initial contact man for a well-orchestrated plan involving the sale and distribution of heroin, in which Avila participated. Finally, while this issue has not explicitly been raised, it is clear that the statements sought to be excluded, which had to do with arrangements for the purchase of controlled substances, were made "during the course and in furtherance of the conspiracy." *See United States v. Weiner,* 578 F.2d 757, 768, No. 75–2973 (slip opinion at 1589) (9th Cir. 1978); *United States v. Snow,* 521 F.2d 730, 733 (9th Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976).

■ Avila next suggests prejudicial error because his private investigator was excluded as a surrebuttal witness under the witness exclusionary rule. The trial judge had made it plain at the outset of trial that all prospective witnesses except a government investigative agent (Granados) were to be excluded from the courtroom and he admonished counsel to remain alert to their obligations under the rule, warning them that their failure to do so could result in the loss of a witness' testimony. The evidence which appellant Avila sought to introduce through the testimony of his investigator, Mr. Rios, concerned the factual issue of a possible obstruction of the view from the interior of the El Patio Bar to the outside of the front door. Agent Granados had testified, contrary to the earlier testimony of appellant's witness Rodriguez, the owner of the bar, that the view was only partially obstructed by a partition. This issue was relevant to the credibility of Rivera, who had testified that, from his position inside the bar, he had observed Avila transfer something to Corona outside of the door.

The appropriate sanction for violation of a witness exclusionary rule is a matter which lies within the sound discretion of the trial court. *United States v. Oropeza,* 564 F.2d 316, 324 (9th Cir. 1977); *United States v. Torbert,* 496 F.2d 154, 157–8 (9th Cir.), *cert. denied,* 419 U.S. 857, 95 S.Ct. 105, 42 L.Ed.2d 91 (1974); *Spindler v. United States,* 336 F.2d 678, 682 (9th Cir.), *cert. denied sub nom. Richards v. United States,* 380 U.S. 909, 85 S.Ct. 894, 13 L.Ed.2d 797 (1965). Disqualification of a witness on that ground, while not the preferred remedy, has been held, in some circumstances, not to constitute an abuse of discretion. *United States v. Torbert, supra.* Here, while no offer of proof was made by appellant's counsel, it seems apparent that the proffered testimony would have been cumulative to that of Rodriguez. Moreover, since counsel stated that Rios had observed the physical layout of the bar *on that day,* August 18, 1977, his proposed testimony would have been of limited relevance to the condition of the premises on June 7, 1977. The witness had admittedly been in court during part of the trial, including the rebuttal testimony of agent Granados, and it is not contended that counsel was unaware of his improper presence. No objection or protestation was heard from counsel following the judge's ruling. Under these circumstances, while it is a close question, we are satisfied that the district court did not abuse its discretion in rejecting Rios' testimony.

■ Appellant Avila also contends that error was committed because the testimony of Rivera, a paid informant, was based on an impermissible fee arrangement. Rivera testified he had worked for the Government about 30 times before, had been already paid $1,750.00 for his work in this case, and expected to receive $250.00 more, a sum which represented money previously owed him and which was not contingent upon his trial testimony. We have carefully considered his testimony and we do not agree that his financial arrangements with the Government were contingent upon the arrest or conviction of the appellants. His testimony to the effect that he received only his expenses, that he was paid as he worked, and that the quality of the heroin involved and the size of the distributing organization weighed as factors in the compensation in no way derogated from the validity of the arrangement. *See United States v. Ladley,* 517 F.2d 1190, 1193 (9th Cir. 1975). Additionally, Avila was afforded the benefit of an appropriate jury instruction on informer testimony.[2]

**2.** The instruction on the testimony of an informer, 1 Devitt & Blackmar, Federal Jury Practice and Instructions § 17.02 (3d ed. 1977), was requested and given. The jury was instructed as follows:

The testimony of an informer who provides evidence against a defendant for pay . . . must be examined and weighed by the jury with greater care than that of the testimony of an ordinary witness. The jury must deter-

■ Avila's last claim is that the evidence against him was insufficient and that the trial court conducted the trial in a prejudicial manner. We have concluded from a study of the record that there was both direct and circumstantial evidence of a highly persuasive nature demonstrating the active participation by Avila in a well-organized scheme for the distribution of drugs. His testimony in his own defense confirmed, at least in part, his contact with Corona on June 7, 1977 and his proximity to the places where certain of the events described earlier in this opinion took place. The verdict of the jury was fully justified. Nor can the trial judge be faulted for any prejudicial conduct. While at one point he anticipated, on the representation of counsel, certain evidence given by Rivera,[3] there was no prejudice to Avila. Although the trial judge could arguably have adopted a more neutral stance in questioning the prosecutor about the anticipated evidence, all was promptly and properly placed before the jury by way of testimonial evidence.

■ Finally, Laranaga makes the unusual claim that the trial court erred in giving certain jury instructions in the wrong order; specifically that the "mere presence" instruction,[4] despite its inherent accuracy, should have been given immediately after the instruction on aiding and abetting.[5] While these instructions were in a sense related to each other, they were, as separately given, entirely consistent and understandable. The court accurately instructed the jury as to the law on aiding and abetting, and that mere presence at the scene of a crime was not sufficient to establish that a defendant was an aider and abettor of the crime. The instructions as a whole were accurate and they adequately conveyed the pertinent law to the jury. The defendant was sufficiently served. *U. S. v. Park*, 421 U.S. 658, 674–5, 95 S.Ct.

mine whether the informer's testimony has been affected by interest or by prejudice against the defendant.

3. During the direct examination of informant Rivera, the following colloquy took place:

THE COURT: Well, Mr. James, what do you anticipate will be the testimony now? Will something be changing hands shortly?

MR. JAMES: Yes, your Honor.

THE COURT: You want him to mark where they were standing when something changed hands?

MR. JAMES: That is correct, your Honor.

THE COURT: All right. That is the question.

THE WITNESS: Okay.

THE COURT: Would you please mark two X's on this chart for Mr. Felix-Corona and Mr. Avila, where they were standing when something changed hands.

MR. FUSILIER: Your Honor, I am going to object. That is assuming something not in evidence.

THE COURT: He hasn't gotten there yet, but I assume that I can rely on counsel's representation.

4. *Mere presence at the scene of the crime and knowledge that a crime is being committed are not enough to establish that any defendant aided and abetted the crime, unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.*

5. So what is aiding and abetting?

In a case where two or more people are charged with the commission of a crime, the guilt of any defendant can be established without proof that he personally did every act constituting the offense charged. Whoever commits an offense against the U. S. or aids, abets, counsels, commands its commission is punishable as if a principal. In other words, every person who wilfully participates in the commission of a crime may be found guilty of that offense.

In order to aid and abet another to commit a crime it is necessary that the accused aider and abettor wilfully associate himself in some way with the criminal venture and wilfully participate in it as he would in something he wants to bring about; that is to say, he wilfully seeks by some act of his to make the criminal venture succeed.

Now you, of course, may not find any particular defendant guilty under an aiding and abetting theory unless you first find beyond a reasonable doubt that every element of the substantive offense, as defined in these instructions, was committed by the person charged with committing it, and then find that the defendant in question participated in its commission as an aider and abettor.

1903, 44 L.Ed.2d 489 (1975); *Morgan v. United States*, 391 F.2d 237, 238 (9th Cir.), *cert. denied*, 393 U.S. 853, 89 S.Ct. 91, 21 L.Ed.2d 122 (1968).

The appellants were convicted after a fair trial on evidence which abundantly demonstrated their guilt. The judgments of conviction are AFFIRMED.